## *Ex parte* McCABE.

### *(District Court, W. D. Texas, Austin Division.* April 2, 1891.)

**1. FOREIGN EXTRADITION—WARRANT.**

Where, upon the extradition of a person charged to be a fugitive from justice, under the treaty with Mexico, December 11, 1861, (12 St. 1199,) a warrant for his arrest is issued by the "county judge and extradition agent," the function so performed is judicial, and not administrative, and is for the purpose of preliminary examination; and the warrant is not invalid because it fails to show his authority as an extradition agent, under article 4 of the treaty, providing that within the frontier states and territories of each country the surrender may be made by the chief civil authority thereof, or by such chief civil or judicial authority of the districts or counties bordering on the frontier as may for this purpose be authorized by said chief civil authority of said frontier state or territory.

**2. SAME—NECESSITY OF COMPLAINT UNDER OATH.**

Under Rev. St. U. S. § 5270, providing that whenever there is a treaty or convention for extradition the officer designated "may, upon complaint made under oath charging any person, * * * issue his warrant for the apprehension of the person so charged," a sufficient complaint on oath is essential to the jurisdiction, and a warrant issued without it is void.

**3. SAME—SURRENDER OF A STATE'S OWN CITIZENS—COMITY.**

In the absence of a treaty stipulation, there is no obligation, under the laws of nations, upon a sovereign state to surrender persons charged with crimes committed in another country, upon demand of the state whose laws they have violated; and where it is provided in an extradition treaty that "neither of the contracting parties shall be bound to deliver up its own citizens under the stipulations of this treaty," the United States will not surrender one of its citizens charged with a murder committed in one of the states of Mexico.

Petition for Writ of *Habeas Corpus.*
*George R. Scott* and *F. R. Graves,* for petitioner.

MAXEY, J. On the 26th of February, 1891, a petition, duly verified by affidavit, was presented to the court on behalf of Mrs. Mary Inez McCabe, stating that she had been arrested by the sheriff of Nueces county, Tex., and was now illegally detained and restrained of her liberty. It is alleged in the petition that the petitioner was born in Bandera county, Tex., of parents of American birth; that her husband, H. T. McCabe, was born in the state of Illinois, of parents of American birth, and that both she and her husband have continued to be and are now citizens of the United States. The further allegations are made:

"That since the 13th day of February, A. D. 1891, she has been unlawfully and illegally restrained of her liberty by one Patrick Whelan, sheriff of Nueces county, and who pretends to be acting under and by authority of a certain treaty and convention between the United States of America and the republic of Mexico, of date the 11th of December, 1861, and by virtue of certain telegraphic and other pretended writs and papers from a pretended officer, who styles himself the county judge of Cameron county, and extradition agent, county of Cameron, and the copies of the which said papers and process are hereto attached."

After reciting other facts, not necessary to consider, the petition prays for the issuance of a writ of *habeas corpus.* Among the papers attached as exhibits to the petition, the only one deserving of notice is the writ issued by Judge FORTO in the following form:

"THE UNITED STATES OF AMERICA.

"*The State of Texas to the Sheriff or any Constable of Nueces County, Texas, greeting:* Whereas, pursuant to the existing treaty between the United States of America and the republic of Mexico for the extradition of criminal fugitives from justice under certain circumstances, the Hon. LAMON F. FLORES, judge in and for the third judicial district of the state of Tamaulipas, and extradition agent in and for said district in said state of Tamaulipas, republic of Mexico, has made requisition and application in due form to me, E. C. FORTO, county judge of Cameron county, Texas, and extradition agent, for the arrest of Maria Inez McCabe, who stands charged with the crime of murder, alleged to have been committed in the town of Reynosa, within the third judicial district, as aforesaid, on the 18th day of August, 1890, by feloniously killing one Max Stein, at such time and place, and that the said Maria Inez McCabe has fled from the custody of the proper officers in the city of Matamoras, in said state of Tamaulipas, and has taken refuge in this state of Texas from the laws and justice of the state of Tamaulipas as aforesaid. And whereas, it appears proper that the said Maria Inez McCabe should be apprehended, as requested in said requisition and application made by the said judge of the third judicial district of the said state of Tamaulipas, and extradition agent as aforesaid, on the 14th day of February, 1891, and that the said charge preferred against her, the said Maria Inez McCabe, be examined in the manner provided for by law: Now, I, E. C. FORTO, county judge of Cameron county, Texas, and extradition agent, do hereby command you to arrest the said Maria Inez McCabe, if to be found in your county, and bring her before me as such county judge of said Cameron county, Texas, and extradition agent, at my office in the city of Brownsville, in the said county of Cameron, and state of Texas, forthwith, then and there to answer the said requisition and application for arrest and extradition, as aforesaid, and that the necessary proceedings may be had in pursuance to law, in order that the criminality of the said Maria Inez McCabe may be heard and considered, and, if deemed sufficient to sustain the charge, that she may be surrendered under the law. Herein fail not, but of this writ make due return, showing how you have executed the same.

"Witness my official signature, and the seal of the county court of the county of Cameron, at office in the city of Brownsville, Texas, on this 16th day of February, A. D. 1891.

    [Signed]                      "E. C. FORTO,
     "County Judge and Extradition Agent, Cameron County, Texas."

On the day the petition was presented, a writ of *habeas corpus* was directed to be issued to Sheriff Whelan, and a *certiorari* to Judge FORTO, and the order of court further directed the clerk to transmit a copy of the order, by registered mail, to the consul of the republic of Mexico, resident at Brownsville. The writs to the county judge and sheriff, respectively, were made returnable the 17th of March, 1891, on which day the sheriff produced the prisoner before the court, and made return to the *habeas corpus*, the material portion of which is in the following words:

"In obedience to the within writ, I hereby produce before the Hon. district court of the United States for the western district of Texas Mary Inez McCabe, and attach hereto the writ of E. C. FORTO, county judge of Cameron county and extradition agent, upon which authority I had and held the said Mary Inez McCabe at the time of service upon me of the within writ of *habeas corpus*."

The writ of *certiorari* was not served upon the county judge in Cameron county, but in Austin, and only a few days before the day set for the hearing. His sworn answer shows that it was impracticable for him to procure copies of the proceedings had before him in time for the 17th; and to avoid further delay, the following statement made by Judge Forto, and on file among the papers of the cause, was accepted as a sufficient return to the writ:

"That the warrant for the arrest of Mrs. M. I. McCabe was based on a requisition made by the district judge and extradition agent at Matamoras, Mexico. That said requisition charges the said M. I. McCabe with having committed the crime of murder, as recited in said warrant. That said requisition is not certified to by the American consul residing at Matamoras, Mexico, and that it came to me through the Mexican consul at Brownsville."

As directed by the order of court, the clerk transmitted by registered mail a copy of the order before mentioned to the Mexican consul at Brownsville, and his reply, acknowledging receipt, is now on file.

It will thus be seen that the warrant for the arrest of the prisoner was predicated upon the requisition made by Hon. Lamon F. Flores, federal judge of the third district of the state of Tamaulipas, and acting as extradition agent for said district. And the sheriff of Nueces county was commanded by the warrant to arrest Mrs. McCabe, and take her before the county judge of Cameron county, "then and there to answer the said requisition and application for arrest and extradition." Judge Forto had before him no "complaint made under oath" charging the prisoner with crime, nor was there in fact presented to him any complaint, document, or other paper as a predicate for the warrant, except the requisition of Judge Flores. The only step taken by the county judge was the issuance of the warrant of arrest. Thenceforth he performed no official act in relation to the proceeding. At the hearing on the 17th inst., which was *ex parte*, no one appearing for the Mexican government, the only evidence introduced by the prisoner was on the question of citizenship, and from the proof it clearly appears that both she and her husband are now, and have been continuously since their births, citizens of the United States. The court desires here to state that the expression of its views will be limited solely to the objections urged by counsel for petitioner. Other questions, as those affecting the regularity and validity of the requisition emanating from Judge Flores, and the competency of the sheriff of a county to execute a warrant of arrest issued pursuant to the extradition statutes, and perhaps some others, which are suggested by the proceedings in this case, will be passed over, and their consideration reserved. Upon the foregoing record, the question arises, shall the prisoner be discharged, or remanded to custody to be dealt with by the proper authorities, as the laws of extradition and the treaty between the United States and the republic of Mexico direct? Her counsel insist upon an immediate discharge, and assign in support of their contention three specified grounds: (1) The warrant which issued for the arrest of the petitioner is void, because it fails to disclose upon its face that the officer issuing it was duly authorized for that purpose by the chief ex-

ecutive of Texas. (2) The warrant is without validity for the further reason that it was not based upon a complaint made under oath. (3) The petitioner, being a citizen of the United States, cannot lawfully be surrendered to the authorities of Mexico for punishment for crime committed within the jurisdiction of the latter republic.

The first point requiring the consideration of the court is whether the questions suggested by the objections of counsel are raised in such manner as to be reviewable on a writ of *habeas corpus*. It is settled law that a writ of *habeas corpus* in a case of extradition cannot perform the office of a writ of error. Employing the language of the supreme court:

"The main question to be considered upon such a writ of *habeas corpus* must be, 'Had the commissioner jurisdiction to hear and decide upon the complaint made by the Mexican consul?' and, also, was there sufficient legal ground for his action in committing the prisoner to await the requisition of the Mexican authorities?" *Benson* v. *McMahon*, 127 U. S. 462, 8 Sup. Ct. Rep. 1240.

It is not deemed necessary to enter upon a discussion of the proposition, and the court will content itself, after a careful examination of the authorities, with the statement of the conclusion that the questions in this case are properly presented, and require a distinct ruling. *In re Luis Oteiza* v. *Cortes*, 136 U. S. 330, 10 Sup. Ct. Rep. 1031; *Benson* v. *McMahon, supra; In re Macdonnell*, 11 Blatchf. 170; Rev. St. U. S. § 761.

The objections of counsel will be treated in the order of their presentation.

1. Should it appear upon the face of the warrant for the apprehension of the petitioner that the county judge was duly authorized by the chief executive of Texas to act as a committing magistrate? This contention of counsel originates in a misconception of the respective duties of a judicial officer, prescribed by the statute, and those of a purely executive or administrative officer, as contemplated by the treaty between the United States and republic of Mexico, concluded at Mexico December 11, 1861, and proclaimed by the president of the United States June 20, 1862. 12 St. at Large, 1199. The functions of the two officials are altogether distinct and different in their character. The judicial officer acts in obedience to the general laws regulating the international extradition of fugitives from justice, which supply the requisite judicial machinery to enable the national chief executive to discharge the obligations resting upon our government pursuant to treaty stipulations, thus investing him with the necessary power to preserve the national faith and protect the honor and dignity of the government. On the other hand, the state executive officer, under the treaty with Mexico, is indebted solely to the treaty for whatever power or authority he may possess, and his rights and corresponding duties are plainly limited and prescribed by its stipulations. While by force of the statute and treaty combined the functions of both officers may devolve upon, and be exercised by, one and the same individual, as appears to be the case here, there is no necessary relation between them. The individual may act in a dual capacity, but not necessarily. The two high contracting par-

ties deemed it wise, in stipulating for the requisition and surrender of fugitives who had committed crimes in the frontier states, to clothe, in addition to the president, certain state officers with authority to act in that behalf. While thus acting, they are in no proper sense judicial officers, nor performing a judicial duty. In making the requisition they simply demand the surrender of a fugitive, and in effecting the surrender they deliver him up to the proper authorities after a prior judicial preliminary examination. It may be said—and at this day the soundness of the assertion will scarcely be doubted—that neither national nor state executive possesses the power, under the treaty with Mexico, to surrender a fugitive to the Mexican authorities until a warrant has been judicially issued for his arrest, and an examination had, to the end that evidence of criminality may be heard and considered. No such extraordinary power will be found in the treaty, and none such has place in the statutes passed in aid of and to enforce our treaty obligations with foreign powers for the extradition of fugitive criminals. Reference to the statutes and treaty will verify the correctness of the foregoing views, and demonstrate the fallacy of the position assumed by counsel. "Whenever," the statute provides, "there is a treaty or convention for extradition between the government of the United States and any foreign government, any justice of the supreme court, circuit judge, district judge, commissioner authorized so to do by any of the courts of the United States, or judge of a court of record of general jurisdiction of any state, may, upon complaint made under oath, charging any person found within the limits of any state, district, or territory, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or commissioner, to the end that the evidence of criminality may be heard and considered. If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, he shall certify the same, together with a copy of all the testimony taken before him, to the secretary of state, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made." Rev. St. § 5270.

As provided by the statute, three classes of judicial officers may issue warrants for the apprehension of fugitives in proper cases arising under treaties,—federal judges, judges of state courts of record of general jurisdiction, and commissioners authorized so to do by any of the courts of the United States. In the absence of treaty provisions upon the subject, the warrant of arrest must be issued by the official designated in the statute. The treaty with Mexico is silent upon the point. But counsel invoke article 4 in support of their contention. It is there provided:

"On the part of each country, the surrender of fugitives from justice shall be made only by the authority of the executive thereof, except in the case of crimes committed within the limits of the frontier states or territories, in which latter case the surrender may be made by the chief civil authority thereof, or such chief civil or judicial authority of the districts or counties bordering on the frontier as may for this purpose be duly authorized by the said chief civil authority of the said frontier states or territories; or, if from any cause, the civil authority of such state or territory shall be suspended, then such surrender may be made by the chief military officer in command of such state or territory."

As before explained, the authority conferred by article 4 upon state officers is of an executive character; and it may be that, when the final act of surrender is made, which is the only duty contemplated by the article, the order issued for the purpose by the "chief civil or judicial authority of the districts or counties bordering on the frontier," should affirmatively show that the officer effecting the surrender was duly authorized by the chief executive of the state. But in this case no order for the surrender of the petitioner has been issued, nor was one necessary or appropriate. The exigency had not arisen which demanded it. The warrant which was issued by the county judge was for the purpose of compelling the petitioner to appear and submit to a preliminary examination; and the fact that it was issued by an officer who styles himself "county judge and extradition agent, Cameron county, Texas," is of no consequence. In performing the act, the function was judicial not executive. No extradition agent, as such, could issue a warrant of that nature; and, when the duty is performed by a proper state judge, the statute makes it no more incumbent upon him to recite in the warrant the source of his authority than it does in those cases where the warrant issues by an associate justice, circuit or district judge of the United States. To sustain their views counsel refer to the case of *In re Kelley*, 25 Fed. Rep. 268. In that case it is held that the proceeding instituted under the statute and treaty with Great Britian is special, "and the fact that the commissioner [meaning United States commissioner] who issued the warrant is authorized so to do is jurisdictional, and must appear upon the face of the warrant." See, also, *In re Farez*, 7 Blatchf. 34; *Ex parte Lane*, 6 Fed. Rep. 34; Spear, Extradition, 252, 253.

The correctness of the doctrine announced in the cases cited is not challenged. It applies strictly to commissioners, who have statutory power to act only when "authorized so to do by any of the courts of the United States." It has already been shown that no limitation of that kind applies to state judges of the class designated in the statute. The authorities invoked by counsel are altogether inapplicable, having no reference to the precise point here involved. Upon the first question submitted, the court is of opinion that the position taken by counsel for the petitioner is manifestly untenable.

2. The second ground of objection assumes that the warrant cannot legally issue by the committing magistrate in the absence of a complaint made under oath. The statute, which names the state judge as a proper officer to issue the warrant, also, in the same section, makes the

sworn complaint a prerequisite to its issuance. It is provided by the statute that the officer designated "may, upon complaint made under oath, charging any person, * * * issue his warrant for the apprehension of the person so charged." "This shows," says Judge MITCHELL, "that without a sufficient complaint on oath there is no jurisdiction to issue the warrant." Further, he says:

"It was argued that on *habeas corpus* the judge should not go beyond the warrant, and if that were regular he should remand the prisoner. The answer to this is that the commissioner has no power to issue the warrant, and no jurisdiction under the act of congress, until a complaint on oath be made before him. Those, therefore, who oppose the discharge of the prisoner in order to show that there is a valid warrant, are bound to show that it was issued on such complaint on oath, and to show this they must produce the complaint. If when produced it shows its original invalidity, it must fall to the ground and the warrant with it." In re Heilbonn, 1 Parker, Crim. R. 436.

See, also, *In re Farez, supra; In re Henrich,* 5 Blatchf. 414; *Ex parte Lane, supra; In re Roth,* 15 Fed. Rep. 507; Whart. Confl. Law, § 848; Spear, Extradition, p. 250; 7 Amer. & Eng. Enc. Law, 623, and note. Authorities to show that the warrant should be supported by affidavit would seem to be superfluous. The language of the statute is susceptible of but a single construction, and that, by its terms, a sworn complaint is indispensable as a basis for the warrant admits of no question. In this respect the warrant cannot be aided by the treaty, for the sufficient reason that the latter does not supply or provide for the machinery necessary to carry into effect the obligations of the respective governments. It is immaterial to the present inquiry that an extradition agent may have authority, under articles 2 and 4 of the treaty, to make a requisition and effect a surrender. Neither these articles nor others of the treaty give him, as such, or otherwise, power to issue warrants for the apprehension of a fugitive; the authority in that behalf being derived from the statute. No complaint having been made under oath charging the petitioner with crime, the warrant issued by the county judge must be held invalid.

3. Does the treaty with Mexico authorize the surrender of an American citizen to the Mexican government for punishment for crime committed within the jurisdiction of that republic? The judiciary is rarely called upon to decide questions of more magnitude and importance than those arising under treaty engagements involving the reciprocal rights and duties of independent governments. The court therefore approaches with diffidence the performance of so delicate a duty, and has exercised in this case unusual care and diligence in the endeavor to reach a just conclusion,—just to the two high contracting parties, and just to the petitioner, whose liberty is imperiled. It is believed that this precise question has not been determined by any of our courts, state or federal. In the case of *Benson* v. *McMahon, supra,* the supreme court had under consideration certain clauses of the treaty with Mexico, but this point was not involved. The report of that case fails to disclose the citizenship of Benson, who was committed for extradition, and, presumably, he was not a citizen of the United States. The subject of the extra-

dition of criminals has been a prolific source of discussion by jurists, publicists, writers upon international law, and the executive departments of independent states; and, while the discussions disclose a conflict of opinion as to the duty imposed by the laws of nations touching the surrender by one nation to another of fugitives from the justice of the latter, the almost unbroken current of American authority and the practice of our own government go to show that the obligation to surrender does not exist in the absence of treaty engagements to that effect.   In 1835, Judge BARBOUR, afterwards associate justice of the supreme court, had occasion to consider the question in the *Case of Jose Ferreira dos Santos*, 2 Brock. 493.   Referring to the opinions of Grotius, Burlamaqui, Heineccius, Vattel, Puffendorf, and other writers and publicists, the learned judge adopts the view of Puffendorf, which he declares to be, "that the obligation to deliver up a criminal is rather in virtue of some treaty than in consequence of a common and indispensable obligation." On page 509, after a reference to certain treaties between France and other foreign powers, he proceeds:

"Why, let me ask, were all these treaties in ancient and modern times?   I answer, either because the opinion of Puffendorf was considered right, that without a treaty stipulation there was no obligation to surrender, or, at least, the question was so unsettled, the respective rights and obligations of nations so indeterminate, and the refusal on the part of nations to surrender so frequent, that without a treaty there was no obligation at all, or none of any sort of practical value; for what is this imperfect obligation of which the writers speak?   It is the right of one to ask, which involves the right of the other to refuse, and, as applied to this particular subject, the refusal had become so common as to be almost the habitual practice, until treaties were formed concerning it."

He then examines the practice of our own and foreign governments in reference to the subject of extradition of fugitives, and concludes, on page 513, with the expression of opinion "that the government of the United States are not under any obligation to deliver the prisoner, in the absence of any treaty stipulation."

*Holmes* v. *Jennison* came before the supreme court in 1840, two years before the extradition treaty with Great Britain in 1842.   Discussing that case, Mr. Chief Justice TANEY says:

"Since the expiration of the treaty with Great Britain, negotiated in 1793, the general government appears to have adopted the policy of refusing to surrender persons, who, having committed offenses in a foreign nation, have taken shelter in this.   It is believed that the general government has entered into no treaty stipulations upon this subject since the one above mentioned, and in every instance where there was no engagement by treaty to deliver, and a demand has been made, they have uniformly refused, and have denied the right of the executive to surrender, because there was no treaty, and no law of congress to authorize it.   And, acting upon this principle throughout, they have never demanded from a foreign government any one who fled from this country in order to escape from the punishment due to his crimes."   14 Pet. 574.

In 1845 Judge WOODBURY, in the *Case of the British Prisoners*, holds a similar view:

"But without such a stipulation, however fit it might seem in point of morals to surrender citizens of other countries to answer for offenses committed at home against their own laws, it is usually considered that there is no political obligation under the laws of nations to do it." 1 Woodb. & M. 68.

In the same year (1845) the question was considered by Mr. Buchanan, secretary of state, in a communication to Mr. Wise, in which the following language is employed:

"But the practice of nations tolerates no right of extradition. Whatever elementary authors may say to the contrary, one nation is not bound to deliver up persons accused of crimes who have escaped into its territories on the demand of another nation against whose laws the alleged crime was committed. The government of the United States has from the very beginning acted upon this principle. Mr. Jefferson, when secretary of state under the administration of General Washington, declared that ' the laws of this country take no notice of crimes committed out of their jurisdiction. The most atrocious offender, coming within their pale, is received by them as an innocent man, and they have authorized no one else to seize and deliver him up.' * * * The truth is that it has been for a long time well settled, both by the law and practice of nations, that without a treaty stipulation one government is not under any obligation to surrender a fugitive from justice to another government for trial." 2 Whart. Int. Law Dig. pp. 745, 746.

In the year 1847, in *Re Metzger*, Mr. Justice McLean, as the organ of the supreme court, says:

"The surrender of fugitives from justice is a matter of conventional arrangement between states, as no such obligation is imposed by the laws of nations." 5 How. 188.

In a communication of Mr. Cushing, attorney general, to the president, in 1853, he thus states the principle:

"It is the settled politic doctrine of the United States that, independently of special compact, no state is bound to deliver up fugitives from the justice of another state. * * * It is true any state may, in its discretion, do this as a matter of international comity towards the foreign state, but all such discretion is of inconvenient exercise in a constitutional republic organized as is the federal Union; and accordingly it is the received policy of this government to refuse to grant extradition except in virtue of express stipulations to that effect." 6 Op. Attys. Gen. 86; Id. 432.

"The ancient doctrine," says the court of appeals of Kentucky, in 1878, "that a sovereign state is bound by the laws of nations to deliver up persons charged with or convicted of crimes committed in another country, upon the demand of the state whose laws they have violated, never did permanently obtain in the United States. It was supported by jurists of distinction, like Kent and Story, but the doctrine has long prevailed with us that a foreign government has no right to demand the surrender of a violator of its laws, unless we are under obligations to make the surrender in obedience to the stipulations of an existing treaty. * * * As said by Mr. Cushing, in the *Matter of Hamilton*, a fugitive from justice of the state of Indiana: 'It is the established rule of the United States neither to grant nor to ask for extradition of criminals as between us and any foreign government, unless in cases for which stip-

ulation is made by express convention.'" *Com.* v. *Hawes*, 13 Bush, 708, 709.

Mr. Spear, in his work, already cited, page 13, after reviewing the authorities, expresses his conclusion in the following words:

"'The preponderance of authority derived from practice, the legislation of congress, the opinions of the attorney generals of the United States, and the deliverances of the judiciary, both state and federal, clearly show that no department of the general government is either bound or authorized to deliver up fugitive criminals from other countries, except in those cases for which provision is made by treaty. The powers of the government are bestowed by the constitution; and, except as it may be clothed with the extradition power through treaties, no such power is found among the express or implied grants to congress, or among those to the executive department, or among the powers given to the federal judiciary. There can be no discretion in the exercise of the power, since it does not exist at all."

See, also, *Blandford* v. *State*, 10 Tex. App. 627; *U. S.* v. *Watts*, 14 Fed. Rep. 130; Whart. Confl. Laws, § 835; Wools. Int. Law, § 79; 2 Whart. Int. Law Dig. § 268; Wheat. Int. Law, (6th Ed.) pp. 176, 177; 16 Alb. Law J. 361, 366; 7 Amer. & Eng. Enc. Law, p. 600, and notes.

In 1886, the supreme court, discussing the question of extradition of fugitives, observes:

"It is only in modern times that the nations of the earth have imposed upon themselves the obligation of delivering up these fugitives from justice to the states where their crimes were committed for trial and punishment. This has been done generally by treaties made by one independent government with another. Prior to these treaties, and apart from them, it may be stated, as the general result of the writers upon international law, that there was no well-defined obligation on one country to deliver up such fugitives to another; and, though such delivery was often made, it was upon the principle of comity, and within the discretion of the government whose action was invoked, and it has never been recognized as among those obligations of one government towards another which rests upon established principles of international law." *U. S.* v. *Rauscher*, 119 U. S. 411, 412, 7 Sup. Ct. Rep. 234.

In this connection it is worthy of remark that, since the opinion of Mr. Chief Justice TANEY was written, in which the belief is expressed that the United States, "in every instance where there was no engagement by treaty to deliver," have uniformly refused and denied the right of the executive to surrender, the exceptional case is reported of the surrender, in the absence of a treaty, of Don Jose Augustin Argüelles by Mr. Seward to the Spanish government. Referring to this case, it is said by Mr. Wharton (2 Int. Law Dig. p. 746) that "in *Argüelles'* Case, 1864, (cited in Whart. Confl. Laws, § 941; Spear, Extradition, 1,) the defendant was delivered to the Spanish government by Mr. Seward without a treaty, and the proceedings were so summary as to prevent a review on *habeas corpus*." In his comments upon the case, Mr. Spear says:

"The delivery of Argüelles, being wholly without any legal authority, was not at all excusable by the fact that the alleged fugitive was supposed to be guilty of a heinous offense. This supposition, if true, does not change the

principle or the nature of the act. Rules of law do not vary with the merits or demerits of the particular case to which they are applied." Spear, Extradition, p. 13.

While, therefore, investigation discloses that Chancellor Kent of our own country, and several distinguished publicists and writers upon international law of foreign countries, assert, apart from treaty engagements, the obligation to surrender a fugitive from justice, the overwhelming weight of American authority and the practice of our government are clearly in the opposite direction, and deny the existence of any obligation to surrender arising out of the law of nations. What, then, was the result? Treaties for the extradition of fugitive criminals, under certain circumstances, were concluded by the United States with foreign powers, and these treaties, in the terms of article 6 of the constitution, are declared to be the supreme law of the land; and as such supreme law they are to be construed as other laws. "A treaty," says the supreme court, "then, is a law of the land as an act of congress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined; and, when such rights are of a nature to be enforced in a court of justice, that court resorts to the treaty for a rule of decision for the case before it as it would to a statute." *Head Money Cases*, 112 U. S. 598, 599, 5 Sup Ct. Rep, 247; *U. S.* v. *Rauscher*, *supra*. In interpreting treaties, "we are to find out the intention of the parties by just rules of interpretation applied to the subject-matter; and, having found that, our duty is to follow it as far as it goes, and to stop where that stops, whatever may be the imperfections or difficulties which it leaves behind." *The Amiable Isabella*, 6 Wheat. 71. See, also, *Chew Heong* v. *U. S.*, 112 U. S. 536, 5 Sup. Ct. Rep. 255. It is said:

"There is no rule of construction better settled, either in relation to covenants between individuals or treaties between nations, than that the whole instrument containing the stipulations is to be taken together, and that all articles *in pari materia* should be considered as parts of the same stipulation." 2 Whart. Int. Law Dig. p. 29.

The treaty with Mexico being supreme law, it is the duty of courts to take judicial notice of it, and to enforce private rights, when appropriately presented, growing out of its stipulations. The court will therefore proceed to inquire into the construction of the treaty, in order to determine whether our government has authority to surrender the petitioner. If the authority exist, she could not complain of its exercise in a proceeding conforming in all respects to legal requirements. In the absence of such authority, she should not for a moment be restrained by the strong arm of the law, however regular, in other respects, the proceedings might be, or however heinous the offense of which she is accused. Agreeably to its caption, the treaty is one "between the United States of America and the United Mexican States for the extradition of criminals." The introductory clause is as follows:

"The United States of America and the United Mexican States, having adjudged it expedient, with a view to the better administration of justice and to the prevention of crime within their respective territories and jurisdiction,

that persons charged with the crimes hereinafter enumerated, and being fugitives from justice, should, under certain circumstances, be reciprocally delivered up, have resolved to conclude a treaty for this purpose. * * *

"Article 1. It is agreed that the contracting parties shall, on requisition made in their names, * * * deliver up to justice persons who, being accused of the crimes enumerated in article third of the present treaty, committed within the jurisdiction of the requiring party, shall seek an asylum or shall be found within the territories of the other. * * * ,

"Art. 3. Persons shall be so delivered up who shall be charged, according to the provisions of this treaty, with any of the following crimes, whether as principals, accessories, or accomplices, to-wit: Murder, [including assassination, parricide, infanticide, and poisoning.] * * *

"Art. 6. The provisions of the present treaty shall not be applied in any manner to any crime or offense of a purely political character, nor shall it embrace the return of fugitive slaves, nor the delivery of criminals who, when the offense was committed, shall have been held in the place where the offense was committed in the condition of slaves, the same being expressly forbidden by the constitution of Mexico; nor shall the provisions of the present treaty be applied in any manner to the crimes enumerated in the third article committed anterior to the date of the exchange of the ratifications hereof.

"Neither of the contracting parties shall be bound to deliver up its own citizens under the stipulations of this treaty." 12 St. pp. 1199–1202.

The foregoing extracts embrace all the treaty stipulations which in any manner affect the present inquiry. What, then, was the purpose and intention of the two governments in inserting the stipulation: "Neither of the contracting parties shall be bound to deliver up its own citizens under the stipulations of this treaty?" We have seen that, with substantial unanimity, American jurists and statesmen recognized, under the law of nations, no obligation to surrender a fugitive, whether citizen or alien, and that by our government it was never done except in few, if more than one, isolated instances. Hence the resulting necessity to enter into treaty engagements for that purpose. Hence the extradition statute of 1848 and amendments, embodied in Rev. St. § 5270 et seq., which, in conjunction with treaties, the supreme court affirms in *Rauscher's Case, supra,* "are in their nature exclusive." If there were no pre-existing obligation to extradite a fugitive, the obligation must necessarily grow out of either statute law or treaty engagement. It is therefore apparent that the purpose of the treaty was to authorize the parties to do something which they had no previous authority to do. The parties come together, through their respective representatives, and make an agreement—an obligatory, binding agreement—to surrender, under certain circumstances, persons who commit crimes and flee from offended justice. They are authorized to act as they bind themselves. The agreement is mutual, the rights and obligations reciprocal. If power to surrender be not affirmatively given, the right to demand a fugitive can have no existence. The right to demand implies, *ex vi termini,* the corresponding authority and obligation to surrender. But both to exist should be founded upon express stipulations. The agreement here is, in article 1 of the treaty, that the contracting parties shall, on requisition made in their name, deliver up persons, who, being accused of crimes, etc. "Persons," without qualification, would necessarily include all

persons, citizens and aliens alike; and, under that general designation, the executive, it is believed, could not lawfully withhold the surrender of an American citizen upon requisition made by the republic of Mexico. But the treaty does not stop there. A subsequent limiting clause denies the obligation to surrender a citizen: "Neither of the contracting parties shall be bound to deliver up its own citizens under the stipulations of this treaty." The obligation to deliver being denied, upon what can rest the authority? It did not exist in our government, as already shown, independent of treaty engagements, or, if existing as a mere matter of comity or courtesy, there was no lawful mode of enforcing it; and certainly it finds no countenance either in the constitution or laws of congress. The former is silent as to extradition, considered from an international stand-point, and simply confers the general power to make treaties, from which springs the right of the treaty-making power to negotiate with foreign governments for the extradition of fugitives. All the inferences and deductions to be drawn from the statutes would seem clearly to support the view taken by the court; that is, there should be a binding treaty stipulation to authorize the executive to surrender a fugitive. The first act of congress on the subject was approved August 12, 1848. Its caption reads: "An act for giving effect to certain treaty stipulations between this and foreign governments, for the apprehension and delivering up of certain offenders." 9 St. at Large, 302. Section 5270, Rev. St., which is, in substance, the same as the first section of the act of 1848, provides that, if the officer upon the preliminary hearing deems the evidence sufficient to sustain the charge, "he shall certify the same * * * to the secretary of state, that a warrant may issue upon the requisition of the proper authorities for the surrender of such person, according to the stipulations of the treaty or convention." The warrant for surrender does not issue according to the will or discretion of the executive, but agreeably to the stipulations of the treaty; that is to say, according as the parties have obligated themselves by treaty engagements. If it were otherwise, if the executive could at his option and in his discretion transport for trial to a foreign country a person accused of crime, he would in such cases exercise a power which, it is thought, finds no sanction under our constitutional form of government. While nations are not careful to screen criminals seeking an asylum in their midst, personal liberty is so jealously guarded by the American constitution that its safety and security should not be dependent upon the exercise of the arbitrary will and discretion of any official, however lofty his official station. The statute, therefore, employing apt words to confine the warrant of surrender to that class of persons and offenses as to which the parties have entered into binding treaty stipulations, should be held to exclude other classes, and to deny authority or discretion to surrender where the obligation is by treaty expressly denied. *U. S.* v. *Rauscher, supra,* is referred to in support of this view. While the questions in the two cases are dissimilar, the general principles underlying the *Case of Rauscher* have direct application to the case before the court.

It will not be amiss to refer, as germane to the proposition discussed, to the extradition treaties concluded between the United States and foreign nations. By the author, 7 Amer. & Eng. Enc. Law, published in 1889, it is stated there were at that time in force 33 of such treaties. They are chronologically arranged as follows: Great Britain, 1842; France, 1843; Hawaiian Islands, 1849; Swiss Confederation, 1850; Prussia and other states, 1852; Bremen, 1853; Bavaria, 1853; Wurtemberg, 1853; Mecklenburg-Schwerin, 1853; Mecklenburg-Strelitz, 1853; Oldenburg, 1853; Schaumburg-Lippe, 1854; Hanover, 1855; Two Sicilies, 1855; Austria, 1856; Baden, 1857; Sweden and Norway, 1860; Venezuela, 1860; Mexico, 1861; Hayti, 1864; Dominican Republic, 1867; Italy, 1868; Republic of Salvador, 1870; Nicaragua, 1870; Peru, 1870; Orange Free State, 1871; Ecuador, 1872; the Ottoman Empire, 1874; Spain, 1877; Netherlands, 1880; Belgium, 1882; Grand Duchy of Luxemburg, 1883; Empire of Japan, 1886. Those with Prussia, Bremen, Bavaria, Wurttemberg, Mecklenburg-Schwerin, Mecklenburg-Strelitz, Oldenburg, Schaumburg-Lippe, Hanover, Austria, Baden, Hayti, Peru, the Ottoman Empire, Spain, the Netherlands, and Belgium, contain a stipulation substantially in the very words (the meaning being precisely the same) of the concluding clause of the sixth article of the treaty with Mexico, to-wit: "Neither of the contracting parties shall be bound to deliver up its own citizens under the stipulations of this treaty." The corresponding clause in the treaties with the Two Sicilies, Sweden, and Norway, and the republic of Salvador is as follows:

*The Two Sicilies.* "Art. 24. The citizens and subjects of each of the high contracting parties shall remain exempt from the stipulations of the preceding articles, so far as they relate to the surrender of fugitive criminals."

*Sweden and Norway.* "Art. 4. Neither of the contracting parties shall be bound to deliver up, under the stipulations of this convention, any person who, according to the laws of the country where he shall be found, is a citizen or a subject of the same at the time his surrender is demanded."

*Republic of Salvador.* "Art. 5. In no case and for no motive shall the high contracting parties be obliged to deliver up their own subjects." Spear, Extradition, 575-628; Rev. St. relating to District of Columbia, Post-Roads, and Public Treaties.

A similar clause is not contained in any of the other treaties above mentioned. The preamble to the treaty with Prussia and several other states contains the recital:

"Whereas, the laws and constitution of Prussia and of the other German states, parties to this convention, forbid them to surrender their own citizens to a foreign jurisdiction, the government of the United States, with the view of making the convention strictly reciprocal, shall be held equally free from any obligation to surrender citizens of the United States."

It is apparent the recital, which is but the reason assigned by Prussia for refusing to extradite her citizens, does nothing more than relieve the United States from the obligation to surrender. But the clause in article 3, already quoted, which embodies the agreement of the parties, the binding part of the compact, goes further, and, in effect, denies the right of

either party to deliver up its own citizens. Such is the view entertained of this particular clause by Mr. Wharton. "If a German," he asserts, "comes to us, commits a crime, and then returns to his own land, though we cannot demand his surrender, yet he may be punished, and restitution awarded, under proceedings from his own sovereign. But if an American goes to Germany, and there is guilty of a crime against the territorial law, and returns to America, his offense goes unpunished. He cannot be punished by us, because our courts take no jurisdiction of offenses committed abroad against foreign laws. He cannot be surrendered to Germany, because our treaties with Germany expressly prohibit such surrender." Whart. Confl Laws, (2d Ed.) § 841, note 2. And in the text, same section, he further says: "An exception to this effect exists in our treaties with Prussia and the North-German states, with Bavaria, Baden, with Norway and Sweden, with Mexico, with Austria, and with other states to be hereafter specified."

As indicating the construction given by Mr. Lawrence, a writer of distinction, to the clause of the treaty in question, he makes the following classification of our extradition treaties: "(1) Those excepting the subjects of the other contracting power. (2) Those containing no such exception." Under the first are embraced the treaties with Mexico, Prussia, and others. The second includes those with Great Britain, Switzerland, etc. Whart. Confl. Laws, § 857, notes. To same effect see 7 Amer. & Eng. Enc. Law, pp. 616, 617, par. 11. "Some of the extradition treaties of the United States," says Mr. Spear, "expressly provide that neither party shall be required to deliver up its own citizens, which is equivalent to saying that neither will, in respect to such citizens, furnish any facility to the other for bringing them to justice for any offense which they may commit against its laws; and hence, if, under such a treaty, either party should by mistake deliver up one of its citizens, it clearly would not be allowable for the other to put that citizen on trial upon the pretext that the terms of the treaty relate only to the extradition, and have no relation whatever to the trial, either as to the person or the offense to be tried." Spear, Extradition, 79.

All of our law-writers, without an exception, brought to the attention of the court, concur in the opinion that the sixth article of the treaty with Mexico forbids the United States from surrendering their own citizens. Nor is there less uniformity in the practical construction given that article by the department of state. And such construction by a department of the government charged with the administration of a law, although not binding upon the courts, should properly receive great weight when the law is sought to be judicially construed. The rule should apply with special force to that class of cases, where, like the one before the court, the national chief executive, acting through the state department, is indued with the ultimate power of withholding the final warrant for surrender of the fugitive. Rev. St, §§ 5270, 5272; *In re Stupp*, 11 Blatchf. 125, and note; Spear, Extradition, 245, 246. The proposition asserted is sustained by numerous authorities. Mr. Justice HARLAN, in *U. S.* v. *Johnston*, clearly states the principle.

"In view of the foregoing facts, the case comes fairly within the rule, often announced by this court, that the contemporaneous construction of a statute by those charged with its execution, especially when it has long prevailed, is entitled to great weight, and should not be disregarded or overturned except for cogent reasons, and unless it be clear that such construction is erroneous." 124 U. S. 253, 8 Sup. Ct. Rep. 446.

Says the court in *U. S.* v. *Hill:*

"In the construction of a doubtful and ambiguous law, the contemporary construction of those who were called upon to act under the law, and were appointed to carry its provisions into effect, is entitled to very great respect." 120 U. S. 182, 7 Sup. Ct. Rep. 510; *U. S.* v. *Philbrick*, 120 U. S. 59, 7 Sup. Ct. Rep. 413.

The same doctrine was applied in *Brown* v. *U. S.*, where it is said:

"It must be conceded that, were the question a new one, the true construction of the section would be open to doubt. But the findings of the court of claims show that soon after the enactment of the act the president and the navy department construed the section to include warrant as well as commissioned officers, and that they have since that time uniformly adhered to that construction, and that under its provisions large numbers of warrant officers have been retired. This contemporaneous and uniform interpretation is entitled to weight in the construction of the law, and in a case of doubt ought to turn the scale." 113 U. S. 570, 571, 5 Sup. Ct. Rep. 648; *Railway Co.* v. *State*, 77 Tex. 388, 12 S. W. Rep. 988, and 13 S. W. Rep. 619; *U. S.* v. *Payne*, 8 Fed. Rep. 892.

To the consideration, then, of the practice of the state department in construing the last clause of the sixth article of the treaty the attention of the court will be next briefly directed.

(1) In 1874, says Mr. Frelinghuysen, in discussing the *Trimble Case*, a Mexican, Francisco Perez, charged with the murder of Joseph Alexander, an American, at Brownsville, Tex., escaped into Mexico, and Mr. Fish, secretary of state, declined to prefer a formal requisition to the Mexican government for the surrender of the fugitive.

(2) The Mexican authorities in 1884 made demand on our government for the extradition of Alexander Trimble, a citizen of the United States, who was accused of crimes committed in the republic of Mexico. The secretary of state, Mr. Frelinghuysen, construing the treaty as inhibiting the surrender of an American citizen, refused to deliver up Trimble. In a carefully prepared opinion in that case he states his conclusion in the following words: "I understand the treaty with Mexico as reading thus: 'The president shall be bound to surrender any person guilty of crime, unless such person is a citizen of the United States.'" Senate Ex. Doc. No. 98, 1st Sess. 48th Cong.

(3) Charles Hudson, an American citizen, was held in Texas, in 1888, for extradition to Mexico on a charge of robbery committed in that republic. In response to a letter from the governor of Texas, Mr. Bayard, secretary of state, replies:

"I have the honor to acknowledge the receipt of your letter of the 18th instant in relation to the case of Charles Hudson, held in Texas for extradition to Mexico on a charge of robbery. It being alleged that Hudson is a citizen of the United States, you request to be informed whether the department will

adhere to its former ruling in the *Trimble Case*, since that ruling, if applied to the case in question, might prevent the extradition of the prisoner, and render futile the efforts and expenditures of the Mexican government to obtain his surrender. As the decision of the department in the *Trimble Case* is understood, it was held that as, under the extradition treaty between the United States and Mexico, ' neither of the contracting parties shall be bound to deliver up its own citizens,' the president would not be authorized, in the absence of an express grant of power under the laws of the United States, to surrender to Mexico a citizen of the United States. The treaty provision referred to, which is found similarly stated in many of our extradition treaties, was held to negative any obligation to surrender, and thus to leave the authorities of this government without authority to act in such a case. After due consideration, the department is of opinion that the construction given to the treaty in the *Trimble Case* is correct." (See letter on file in department of state, Austin, Tex.)

(4) More recently, and within the past 60 days, the question was considered by Mr. Blaine, present secretary of state, whose letter to Hon. W. H. Crain is published in the public prints. Dr. Martinez, it is said, was basely assassinated on the streets of Laredo, Tex., by persons who fled to Mexico. On behalf of citizens of Laredo, Mr. Crain requested the state department to take steps looking to the extradition of the assassins. That portion of the secretary's letter deemed pertinent to the present question reads as follows:

"The department regrets that the present conventional relations between the United States and Mexico do not admit of a demand for the extradition of the assassins, since it is stated they are citizens of Mexico. Present treaty provides that neither of the contracting parties shall be bound to deliver up its citizens, and, as this clause has been held to preclude the surrender of a citizen of the United States, Mexico refuses to give up her citizens. This question was last agitated in the well-known case of Alexander Trimble and his associates, who were charged with murder and robbery in 1884. They were arrested in Texas with a view of their extradition by the authorities of that state, and when the case was reported to their government, and the fact of their citizenship of the United States was disclosed, this department interfered, and they were discharged. In view of this, and several prior and subsequent cases in which a similar construction has been given to the treaty, this government is precluded from demanding the extradition of the fugitives in the present instance."

Thus it appears that, extending through a period of 17 years, 4 different administrations of the federal government have invariably held that no authority was conferred upon the executive, by the sixth article of the treaty, either to demand of the Mexican authorities the extradition of their subjects committing crimes in the United States, or to surrender an American citizen upon demand made by the republic of Mexico. Following the construction so consistently applied to the treaty, the executive department, whose appropriate duty it is to execute the treaty pursuant to its stipulations and statutory requirements, has uniformly refused to surrender our own citizens; and it may be well said, if doubt exist as to the true construction of the treaty, which the court freely admits is not entertained in the present case, this contemporaneous and uniform interpretation "ought to turn the scale." So far as the court is

·advised, there is but one opinion of the question by law-writers and the executive department of our own country. Nor can it be accurately said that the Mexican courts have authoritatively placed a different con-.struction upon the treaty. There is but a single instance known to the .court where the question was brought to the attention of their judicial tribunals. That is a case referred to by Mr. Foster, minister to Mexico, in a communication to Mr. Evarts, secretary of state, which will be found but imperfectly reported in 1 Ex. Doc. (3d. Sess. 45th Cong.) 1878-79, pp. 560-567. It appears therefrom that in 1877 two persons, Dominguez and Barrera, accused of murder in Texas, fled to Mexico, and the authorities of Texas applied to those of the state of Tamaulipas for their extradition. "They were arrested, and their delivery ordered by the federal executive through the department of war. But the prisoners applied to ·the district judge of Matamoras for *amparo*, or protection, a proceeding somewhat similar to our writ of *habeas corpus*, which application the judge sustained; a decision based upon the ground that, as Mexican citizens, extradition would be a violation of the individual guaranties of the federal constitution. An appeal was taken by the prosecuting attorney from this decision, and the case was thus brought before the federal supreme court. After a lengthy discussion of the case, and a consideration of all the constitutional, international, and political questions either involved or introduced, in which almost all the magistrates of the court participated, the decision of the district judge of Matamoras was reversed, and the court decided, by a vote of 9 to 5, that the individual guaranties of the Mexican constitution would not ·be violated by the extradition of the criminals." See Mr. Foster's letter, page 560. Whether the prisoners were eventually delivered up to the Texas authorities is not disclosed by the report. But it does appear there was no order made for their surrender, nor for their discharge. They were simply held for the purpose of inquiring into the question of their citizenship. Mr. Foster inclosed with his report opinions of only two of the judges, Chief Justice VALLARTA and Magistrate RAMIREZ, and a brief extract from the opinion of Magistrate BAUTISTA. No other opinions appear in the volume referred to. Chief Justice VALLARTA and Magistrate RAMIREZ discussed the question, among others, of the authority of the Mexican government, under the sixth article of the treaty, to surrender its citizens to the United States upon demand made by the proper officers. Upon that point Magistrate RAMIREZ says: "I think, also, that while our federal constitution and the extradition treaty of December 11, 1861, are in force, the executive power cannot consent to the extradition of any Mexican citizen." The chief justice maintained the contrary view, holding a Mexican citizen to be subject to extradition. The reasoning and conclusions of both judges are entitled to respectful consideration, but they are in no manner controlling upon our courts; and certainly, in no event, would the mere expression of opinion upon a collateral question establish a precedent to be followed by other tribunals. What was said was mere *dicta*, obviously apparent from the language of the chief justice: "A case," says he, "of the extradition of

Mexicans, as I have said, is not treated here. The evidence of documents exists to the effect that the order issued by the department of war was given in the understanding that Dominguez and Barrera were American citizens, and that General Canales consulted the government in regard to this point." The interpretation of the treaty by the executive branch of our government, and its unbroken practice in obedience thereto, the opinions of our law-writers, the logical deductions fairly drawn from the application of established rules of construction, and finally all these, supplemented by a protesting minority of the federal supreme court of Mexico, stand opposed to the views of Chief Justice VALLARTA. That criminals should be punished, and that nations should render to each other all lawful assistance in their power to effectuate that end, may be readily conceded. But ours is a government of law, and the rights, powers, and prerogatives of the executive are derived from the constitution and statutes, and treaties made in pursuance thereof. If these deny, or do not confer, authority to surrender a citizen to a foreign state, then its exercise would be but the exertion of usurped power. Borrowing the words of Mr. Frelinghuysen: "It would be a great evil that those guilty of high crime, whether American citizens or not, should go unpunished; but even that result could not justify an usurpation of power." Nor is judicial usurpation less reprehensible. Both are wrong; both defy the law, and are repugnant to the genius of our institutions.

It is cause for regret that this case cannot reach the supreme court, to whose judgment the questions involved should be remitted for final and conclusive determination. But that fact should not deter the trial court from the performance of its duty. If the prisoner be unlawfully restrained of her liberty, an order for her enlargement should be entered without hesitation. Being of opinion, for the reasons given, (1) that the warrant issued by the county judge for the arrest of the petitioner is void; (2) that her surrender is not authorized by the treaty with Mexico, —it results that her detention is illegal, and she should therefore be discharged from custody; and it is so ordered.