Ex parte CHARLTON.

(Circuit Court, D. New Jersey. January 23, 1911.)

1. HABEAS CORPUS (§ 92*)—EXTRADITION—REVIEW OF PROCEEDINGS.

The court, on habeas corpus for the discharge of an alleged fugitive from the justice of a foreign country held for removal thereto, may only determine whether the findings of the committing magistrate are based on competent evidence, and whether the foreign government has formally demanded the extradition of the fugitive.

[Ed. Note.—For other cases, see Habeas Corpus, Cent. Dig. § 87; Dec. Dig. § 92.*

Scope of review on habeas corpus to procure release of person sought to be extradited, see note to Bruce v. Rayner, 62 C. C. A. 506.]

2. CRIMINAL LAW (§ 230*)—GRAND JURY (§ 37*)—INSANITY OF ACCUSED—PRELIMINARY HEARING.

The inquiry into the question of the sanity of accused, alleged to have become insane since the commission of the offense, can only be raised at or immediately before the trial, and only in the forum where the trial is pending, and the inquiry is not proper on the hearing before the committing magistrate.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 484; Dec. Dig. § 230;* Grand Jury, Cent. Dig. § 78; Dec. Dig. § 37.*]

3. EXTRADITION (§ 14*)—INTERNATIONAL—PROCEEDINGS—INQUIRY INTO PRESENT SANITY OF FUGITIVE.

On extradition proceedings for the removal to a foreign country of an alleged fugitive from the justice thereof, evidence of the present sanity of accused is improper, and the foreign government, whose laws have been violated, is the only authority to make such investigation to be instituted by it preliminary to the trial on the merits.

[Ed. Note.—For other cases, see Extradition, Cent. Dig. §§ 15, 16; Dec. Dig. § 14.*]

4. CRIMINAL LAW (§ 623*)—INSANITY—DEFENSE.

The question of the sanity of accused at the time of the commission of the crime charged is a matter of defense and can only be interposed when he is put on his trial on the merits.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1391–1398; Dec. Dig. § 623.*]

5. EXTRADITION (§ 14*)—INTERNATIONAL EXTRADITION—PROCEEDINGS BEFORE COMMITTING MAGISTRATE—EVIDENCE.

On extradition proceedings for the removal to a foreign country of an alleged fugitive from the justice thereof, evidence of the insanity of accused at the time of the commission of the offense is inadmissible.

[Ed. Note.—For other cases, see Extradition, Cent. Dig. §§ 15, 16; Dec. Dig. § 14.*]

6. CONSTITUTIONAL LAW (§ 257*)—DUE PROCESS OF LAW—INTERNATIONAL EXTRADITION—TREATIES—COMPLIANCE.

Where an extradition treaty subsists with a foreign government under the Constitution and law of the land, a surrender of an alleged fugitive in pursuance thereof is in accordance with the due process of law requirement of the Constitution.

[Ed. Note.—For other cases, see Constitutional Law, Dec. Dig. § 257.*]

7. EXTRADITION (§ 2*)—TREATIES—CONSTRUCTION.

The construction of an extradition treaty, made by the Constitution a part of the supreme law of the land, is for the courts, and they are not bound by the construction placed thereon by the executive or diplomatic

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

branches of the government, or by the construction placed thereon by the foreign country with whom the treaty is made.

[Ed. Note.—For other cases, see Extradition, Cent. Dig. § 2; Dec. Dig. § 2.*]

**8.** EXTRADITION (§ 2*)—TREATIES—CONSTRUCTION—"PERSONS."

The word "persons" in the extradition treaty between the United States and Italy, entered into in 1868 (15 Stat. 629) and amended in 1884 (24 Stat. 1001), providing for the surrender of persons charged with enumerated crimes. is sufficiently broad to embrace citizens and subjects of the contracting parties, and a citizen of the United States, who while in Italy commits an offense, and who then flees to the United States. is within the treaty and may be extradited thereunder, though Italy has always construed the word so as not to include its citizens and subjects.

[Ed. Note.—For other cases, see. Extradition, Cent. Dig. § 2; Dec. Dig. § 2.*

For other definitions, see Words and Phrases, vol. 6, pp. 5322–5335; vol. 8, p. 7752.]

**9.** EXTRADITION (§ 2*)—TREATIES—JUDICIAL DETERMINATION.

The court may not declare that the extradition treaty between the United States and Italy, entered into in 1868 (15 Stat. 629) and amended in 1884 (24 Stat. 1001), is abrogated merely because Italy refuses to surrender its subjects, committing crimes in the United States and then fleeing to Italy, where the United States has dealt with the treaty as subsisting, and has honored the requisition of the Italian government for the surrender of its citizens, and the court may not go behind such acts and say that the treaty has been ended.

[Ed. Note.—For other cases, see Extradition, Cent. Dig. § 2; Dec. Dig. § 2.*]

**10.** EXTRADITION (§ 2*)— INTERNATIONAL — STATUTES — TREATIES —CONSTRUCTION.

Rev. St. § 5270 et seq. (U. S. Comp. St. 1901, p. 3591), providing for the extradition of fugitives from the justice of a foreign country, and an extradition treaty between the United States and a foreign country, must be construed together to determine the requisites of a formal demand for the surrender of a fugitive, except a treaty, when later, controls where it is in irreconcilable conflict with the statute.

[Ed. Note.—For other cases, see Extradition, Cent. Dig. § 2; Dec. Dig. § 2.*]

**11.** EXTRADITION (§ 14*)—INTERNATIONAL—PROCEEDINGS.

Under Rev. St. § 5270 (U. S. Comp. St. 1901, p. 3591), providing for the extradition of fugitives from the justice of a foreign country, an alleged fugitive may be arrested under a warrant issued by the committing magistrate on the complaint of a representative of the foreign country, and the committing magistrate can only determine whether a certificate from the Secretary of State, attesting that a requisition has been made by the foreign government, has been issued, whether the offense charged against accused is extraditable under any treaty, whether the person brought before him is the one accused of crime. and whether there is probable cause for holding accused for trial, and the evidence in that respect must be such as, according to the law of the state in which accused is apprehended. is sufficient to commit him for trial.

[Ed. Note.—For other cases, see Extradition, Cent. Dig. §§ 15, 16; Dec. Dig. § 14.*]

**12.** EXTRADITION (§ 14*)—INTERNATIONAL—PROCEEDINGS.

Where the certificate of the Secretary of State. attesting that a requisition has been made by a foreign government to secure the preliminary arrest of a person charged with crime, was exhibited to the committing magistrate between the time of the arrest of accused under a warrant issued on the complaint of a representative of the foreign country, and

the final hearing, there was a sufficient compliance with Rev. St. § 5270 et seq. (U. S. Comp. St. 1901, p. 3591), providing for the extradition of fugitives from the justice of a foreign country, and the treaty between the United States and Italy, entered into in 1868 (15 Stat. 629) and amended in 1884 (24 Stat. 1001).

[Ed. Note.—For other cases, see Extradition, Cent. Dig. §§ 15, 16; Dec. Dig. § 14.*]

13. EXTRADITION (§ 10*)—INTERNATIONAL—PROCEEDINGS—WARRANT FOR AR-
REST.

Where an extradition treaty, providing for the surrender of persons committing enumerated crimes, exists between the United States and a foreign government, a "request" by the foreign government for the surrender of a fugitive is a sufficient "demand" for the surrender.

[Ed. Note.—For other cases, see Extradition, Cent. Dig. § 11; Dec. Dig. § 10.*]

Petition on behalf of Porter Charlton for a writ of habeas corpus and writs of certiorari in aid thereof. Writ of habeas corpus dismissed.

R. Floyd Clarke, for the petition.

Pierre P. Garven, opposed.

RELLSTAB, District Judge (at the conclusion of the argument). The question before me is whether there is legal ground for the present incarceration of Porter Charlton, for the purpose of having him removed to Italy. It arises on a writ of habeas corpus and certiorari and orders issued in aid thereof. ·

The testimony taken before the committing magistrate and the proceedings had in the Department of State in relation to such imprisonment are before me.

The writ of habeas corpus is not one in the nature of a writ of error. I have no other concern with the findings of the committing magistrate than to inquire whether they are based upon competent legal evidence, or with the transactions before the Secretary of State than to ascertain whether the Kingdom of Italy made a formal demand for the extradition of Charlton.

Porter Charlton is charged with having committed the crime of murder in Italy. He was there at the time the murder is said to have been committed. He fled that country and was arrested as he was landing in this country.

The proceedings instituted against him in this state began with a complaint under oath by the vice consul of the Italian government, charging him with the commission of murder. He was apprehended; the warrant being issued by his honor, John R. Blair, judge of the court of oyer and terminer of the county of Hudson of this state. At the hearing, evidence was produced which satisfied the committing magistrate that he was a fugitive from justice; that he was the person desired by the Italian government; and that there was probable cause for holding him for trial. Thereupon he committed him to the county jail of Hudson county to await the surrender by the national government.

It is said in his behalf that the committing magistrate refused to receive evidence of the prisoner's insanity, and that that was legal error. It will be observed that that attack is not made upon the competency of the evidence brought before the magistrate, but because he refused to receive what, in the judgment of the petitioner's counsel, was not only competent, but necessary, evidence to be considered before extradition could be ordered; the point being that the individual, no matter how well identified as the person who committed the act of killing, could not be held legally responsible for that act unless he was a sane person, and therefore evidence of his insanity should have been received.

It is contended in that behalf that the committing magistrate should have received evidence: First, as to his sanity at the time of the commission of the act; and, second, as to his sanity at the time of the hearing. Counsel for the Italian government stated that it was not his mental condition at the time of the hearing that was sought to be established, but his mental condition at the time of his arrest.

Mr. Clarke: That is not the fact, your honor.

The Court: I will pass that distinction, and assume that it is not correct. I will review the question as if the purpose was to examine into his then mental condition.

He was apprehended in the state of New Jersey, and, of course, the first question that presents itself with relation to the matter of insanity is whether that was a proper subject for examination by the committing magistrate. When a man is put upon his trial upon a charge of crime, it is upon the double presumption that he was sane when the act was committed and at the time he is put to his defense. Upon proper allegation a judicial inquiry is instituted to determine whether he is mentally capable of making a defense. This is not, properly speaking, a defense. It is preliminary to the trial itself. The question of his sanity at the time of the commission of the act is a defense. Therefore a man may be sane at the time of committing an offense; still, if he subsequently becomes insane, he may not be tried for such crime during insanity. He may be put on his trial when he is restored to sanity. It follows, therefore, that insanity as a prevention of trial can only be raised at or immediately before his trial, and only in the forum provided by the jurisdiction which he is alleged to have outraged. Until the trial is moved such preliminary investigation cannot be insisted upon, for the authorities may, at their own motion, await returning sanity. Such an inquiry is not proper upon the hearing before the committing magistrate, whose function is merely to determine whether a crime has been committed, and whether the evidence indicates that the accused committed it. Nor can it be raised before the grand jury, whose function it is to sift the evidence on the part of the state and determine whether sufficient cause appears to put the accused upon trial. Therefore, upon extradition proceedings, an inquiry into the present sanity of the person arrested is improper. The state or kingdom whose laws have been violated, and whose duty it is to vindicate them, is the only authority to make this investigation, to be instituted by them preliminary to the trial

upon the merits. The question of the sanity of the prisoner at the time of the hearing was therefore not one to be investigated by the committing magistrate.

The question of the prisoner's sanity at the time of the commission of the crime, as already stated, is a matter of defense and one that can be interposed only when he shall be put on his trial on the merits. That inquiry in the present case requires an examination of the prisoner's mental condition and conduct at and about the time of the commission of the crime. The witnesses to testify to such facts are in a foreign country, easily accessible at the place of trial, and whose production here would be attended with great difficulty and considerable expense.

While his present sanity is a question that will depend upon his mental state and conduct evidenced in this country at this time, the question of his previous sanity is one that relates to surroundings in another country, and at a much earlier period of time. The standard of sanity of the country whose justice has been violated governs. It is lamentable, of course, that there should be a different standard on that very important question; but such is the fact.

The first inquiry may not now be made, because it would be premature, as, if he were now pronounced to be insane, he might be sane when the trial upon the merits shall be ready to be moved. A present determination, therefore, on that question, would be inconclusive.

The second inquiry, being one that relates to his defense, could not be entertained by the committing magistrate, as the proceeding before him was but a hearing, and not a trial.

The next contention is that, under our Constitution, the accused, being an American citizen, cannot be extradited unless there is a positive obligation on the part of the United States to surrender its citizens when accused of having committed a crime in a foreign country. To extradite, unless there is a positive obligation, is said to be contrary to the constitutional guaranty generally known as the "due process of law" provision in our Constitution; that in a government like ours, with its constitutional limitations, no American citizen can be surrendered to another country merely out of courtesy or in a spirit of international comity.

Reduced to its last analysis, that contention, I think, is to be determined by this: Whether there is an existing treaty between the United States and Italy which requires that Charlton shall be surrendered to the demanding government. An extradition treaty was entered into in 1868 (15 Stat. 629) between this country and Italy and amended in 1884 (24 Stat. 1001).

In the preamble to the original treaty it is declared that:

"With a view to the better administration of justice and the prevention of crime * * * that persons convicted of or charged with the crimes hereinafter specified * * * be reciprocally delivered up."

In article 1 both governments "mutually agree to deliver up person.; who * * * shall seek an asylum or be found within the territory of the other."

In article 2 it is provided that:

"Persons shall be delivered up who shall have been convicted of or be charged * * * with any of the following crimes: First, murder."

The Italian government has given the word "persons" used in this treaty an interpretation so as to exclude citizens or subjects of the respective countries, and has persistently refused to surrender any Italian subject who has returned there fugitive from the justice of this country.

The contention on behalf of the prisoner is that this construction is either the true one, with the result that Charlton may not be extradited; or, if incorrect, is such a repudiation of a reciprocal obligation as to amount to an abrogation of the treaty, with the result that he, being an American citizen, cannot, at the option of the executive branch of the government, be surrendered, because that would be in violation of Charlton's constitutional rights, namely, not to be deprived of his liberty except by "due process of law."

If an extradition treaty subsists with a foreign government, under our Constitution and law of the land, a surrender of the prisoner in pursuance thereof would be in accordance with the "due process of law" constitutional requirement. Neither the executive branch of our government, though strenuously objecting to this construction placed upon the word "persons" by the Italian government, nor the legislative branch, has taken any steps to a formal abrogation of the treaty. But the very persistence of the Italian government in its refusal has led the American government to desist from any further application for the return to this country of Italian subjects charged with the commission of crime here and who have fled to their own country for an asylum. But that, in my judgment, cannot be construed as an abandonment by this government of its contention that the proper construction of the word "persons" includes subjects and citizens, or as an acknowledgment that the treaty has been abrogated. The executive department has always acted with reference to such treaty as if it were subsisting, and in this particular case has ordered the surrender of Charlton.

On behalf of the latter it is insisted that such provisions are necessarily reciprocal, and are of binding force only so long as they are reciprocally complied with; that upon the deliberate refusal on the part of the Italian government to surrender its own subjects, and thus deny the general and comprehensive meaning of the word "persons," such provisions, ipso facto, were abrogated.

In this behalf it is further contended that while under the principles of international law the sovereignty has the option, and might exercise it, to surrender one of its citizens a fugitive from another's justice, yet that that option could not be exercised by the executive branch of our government because of the "due process of law" constitutional guaranty, but that such option could be exercised only by Congress or the treaty-making power; that as the sovereignty was under no obligation to surrender, and only had the power of option in the premises, the rights of an American citizen could not be invaded except by the intervention of the legislative power, which in such mat-

ters is supreme, and in relation to which the executive was but the agent.

On the question of the construction of the treaty, it is contended that the construction placed thereon by the diplomatic branch of our government, viz., that the word "persons" includes American citizens, and that this country is bound to surrender its citizens, notwithstanding the position taken by the legislative and diplomatic departments of the Italian government refusing to deliver or permit to be delivered their own citizens finding an asylum in that country, is not the true one, and could not be binding upon either Charlton or the courts. Undoubtedly, in view that treaties are made a part of the supreme law of the land by the Constitution which authorizes them, the courts are bound to construe such treaties as they are bound to construe any other law of the land when properly presented for interpretation, and, while the courts will give due consideration to the construction placed upon a treaty by the executive or diplomatic branches of the government, yet upon the courts is placed the duty of acting independently, and to accept full responsibility in determining the construction that is to be given to the treaties. And further, inasmuch as the treaty is by the Constitution made a law of the land, the construction placed upon some of its provisions by the departments of the foreign country with whom the treaty is made, executive, legislative, or judicial, is not controlling. The fact that our courts' interpretation of the true meaning of such provisions may not be acquiesced in by the foreign government is of no consequence when the question is one of enforcing such treaty provisions in this country, and over a person who is within its jurisdiction.

The word "persons," given its ordinary meaning, is sufficiently comprehensive to embrace citizens. The fact that in the countries composing continental Europe a less inclusive meaning has been attributed, one that conforms more to their idea of national policy, will not be accepted as a conclusive canon of construction of words used in international compacts, when other countries no less significant in national importance and in international relations have adopted the more comprehensive meaning, and the one in accord with its etymology. In 31 of the 36 treaties made by this government with foreign countries, in which the word "persons" is used, there have been inserted specific clauses expressly excluding, from the operation of such treaties, the citizens and subjects of such countries. This to my mind is a clear indication that, among the greater number of sovereignties constituting the family of nations, the word "persons," used generally and without qualification, includes the citizens and subjects of the respective contracting nations, and that the international canon of construction asserted for the contrary interpretation does not exist.

The construction that I give to such word in the treaty now under review is that it includes citizens and subjects respectively of the contracting parties. Charlton, therefore, being embraced within what is now determined to be the proper construction of this treaty provision, the remaining question is whether, in view of the persistent re-

fusal of the Kingdom of Italy to give this provision such construction, and its withholding from us, when demanded, its subjects fugitive from our justice, the treaty is abrogated.

In that behalf, it is said that the refusal by Italy to surrender its subjects is such a breach of a reciprocal duty as to prevent the American government from surrendering its citizens. It seems to me that that proceeds upon a false reasoning. In the case of an ordinary contract, it is not held that, because one of the parties violates its terms, the other may not insist upon its being maintained. He has the option of considering the contract at an end, and taking such steps to enforce his rights as he deems best. That is also the option of the United States government. But which department of the government? Manifestly, the political departments—Congress or the treaty-making power—possibly the executive power within certain limitations; assuredly not the judiciary. How can it be said that a court may declare a treaty made between the United States and a foreign sovereignty abrogated, when the political departments of the government are treating it as subsisting? That, it will be observed, is not a question of construction, but of the existence of the agreement. The argument in that behalf, as I understand petitioner's counsel, is that by the conduct of the Italian Kingdom, based on its construction of the word "persons," the convention is at an end. It seems to me that the logic of counsel's argument forces him to that conclusion. If the act of the Italian government does not put it at an end, it is not at an end, because neither Congress nor the treaty-making power of the United States has so considered it.

In that behalf, it is also said that the executive department has not the power to exercise an option. That may be true; but, so far as this question is concerned, it is unimportant. If it has not the power to affirm, neither has it the power to disaffirm, and the treaty continues in the absence of congressional action, or action by the treaty-making power. The American government has dealt with the treaty as subsisting; it has honored the requisition of the Italian government for the surrender of its citizens; and the court has not the power to go behind that act and say that the treaty has been ended.

A further contention is that, under the treaty provisions plus our statute, Charlton's surrender has not been demanded within the time fixed by the treaty—40 days from the time of the arrest. It appears that Charlton was arrested, not pursuant to a formal requisition of the Italian government, but upon the complaint of the vice consul, Italy's representative in this country.

A reference to the statutory requisites for the extradition of fugitives from justice is necessary here for a proper understanding of what is meant by a formal demand. These are to be found in the Act of August 12, 1848, c. 167, 9 Stat. 302; sections 5270–5277, Rev. Stat. (U. S. Comp. St. 1901, pp. 3591–3597); article 5 of the treaty between the United States and Italy of 1868 (15 Stat. 629); and article 2 of the supplemental treaty of 1884 (24 Stat. 1002). These are to be read and construed together; the treaty provisions being the later, of course, control when the two are irreconcilable.

Section 5270 is in force wherever there is a treaty existing, and authorizes the committing magistrate, upon complaint made under oath, to cause to be brought before him any person charged with having committed an extraditable crime in a foreign country, and to hear and consider the evidence of criminality that may be brought against him.

By article 5 of the original treaty, the arrest is made upon the warrant of the executive. By article 2 of the supplemental treaty, an arrest is authorized by the magistrate upon the exhibition to him of a certificate from the Secretary of State, attesting that a requisition has been made by the foreign government to secure the preliminary arrest of the person charged with crime, and on a complaint under oath attesting the commission of the crime.

On the hearing, by section 5270, if the magistrate deems the evidence sufficient to sustain the charge under the treaty, he is to certify his finding, together with a copy of the testimony, to the Secretary of State, that a warrant may issue upon the requisition of the foreign government for the surrender of such person, according to the treaty stipulations, and commit the accused to await such surrender.

By article 2 of the supplemental treaty it is provided that the accused may from time to time be remanded to prison until a formal demand for his extradition shall be made and supported by evidence, as above provided. This article also provides that, if the requisition with the documents provided for be not made by the demanding government within 40 days from the arrest of the accused, he shall be set at liberty.

It will be noted that, by the statute, which is in force in the case of all treaties, an alleged fugitive from justice may be arrested upon complaint, regardless of whether a requisition or demand has been made on this government; that only the surrender of the accused is dependent upon the requisition of such foreign government; and that the warrant for such surrender is issued by the Secretary of State.

The committing magistrate has no concern with what transpired between the foreign government and our own, preceding or subsequent to the issuing of such warrant or certificate. The duty of the committing magistrate is confined to determining: First, whether such warrant or certificate has been issued; second, whether the offense charged against the accused is extraditable under the treaty; third, whether the person brought before him is the one accused of such crime; and, fourth, whether there is a probable cause for holding the accused for trial, the evidence in that respect to be such as, according to the law of the state in which the accused is apprehended, would be sufficient to commit him for trial.

In this case, the certificate from the Secretary of State was exhibited to the magistrate between Charlton's arrest and the final hearing. This, under the authorities, is sufficient. It is contended, however, that, in addition to the requisition from the foreign government, which properly should precede the issue of this certificate—the mandate to the committing magistrate—the Italian government must make a formal demand before the person apprehended may be

removed from the country of his asylum. It seems to me that such a construction is not tenable. Certainly, if a fugitive from another country's justice may be apprehended upon a written complaint under oath, demand for his extradition should be made by the government whose justice has been outraged, before such person should be surrendered. But it is going too far to say that if the demanding government has at some time either preceding the accused's arrest, or before the expiration of the 40 days, formally placed before our government a demand for his extradition, and upon which the Secretary of State's mandate issued, that such foreign government should be again required to make a demand. But assuming that a formal demand different from, and in addition to, the requisition upon which the mandate issued, is required, even such a demand has been made in this case. The Secretary of State has twice certified to this court a communication received by his department from the representatives of the Italian government, and which, as I read it, is a formal demand made under this treaty. True the word used is not "demand." It is "request." But that does not change the effect or significance of the act. Some strenuous persons might use the word "demand," when they mean "request"; and others with more tact or diplomacy will use the word "request," when they mean "demand." But the result is the same. It is a distinct declaration from the foreign government that a certain person is desired, and it amounts, in legal parlance, to a demand. Nor have I any concern with the fact that this emanates from a government that has been persistent in its refusal to surrender its own subjects upon like request or demand. The request or demand was made. It is based upon this treaty. And, whatever construction Italy placed upon the word "persons," it reached the Department of State as a demand under that treaty. Our government honored it. It is a part of the records in the Secretary of State's office; it may not actually have been recorded in the books, and may not even appear in the index. But it is there, and I can see nothing in the statute or the treaty that requires anything more formal than the fact of making the demand.

The result is that the writ of habeas corpus must be dismissed.