### UNITED STATES ex rel. NEIDECKER v. VALENTINE, Police Com'r (three cases).*

Nos. 216-218.

Circuit Court of Appeals, Second Circuit.

Jan. 13, 1936.

Frederick R. Coudert, Jr., of New York City (Mahlon B. Doing, of New York City, of counsel), for appellants.

Davis, Polk, Wardwell, Gardiner & Reed, of New York City (Frank L. Polk and Porter R. Chandler, both of New York City, of counsel), for appellee.

Before MANTON, L. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

These are appeals from the denials of writs of habeas corpus to review the legality of the relators' detention in the following circumstances. Citizens of the United States, they were taken into custody by the respondent, Valentine, police commissioner of New York, upon cable request from the proper French authorities; the charge against them concerned financial dealings in Paris, whence they had fled to New York to escape arrest. Upon the request of the "acting" French consul, a United States Commissioner for the Southern District of New York issued warrants for their arrest in pursuance of section 651 of title 18, U.S. Code (18 U.S.C.A. § 651); the writs were allowed at this point in the proceedings. The relators agree that they cannot succeed, unless the commissioner had no power to hold them awaiting the outcome of the proceedings, and that he had that power unless our treaty with France does not authorize the Secretary of State under any circumstances to surrender Americans who have committed extraditable crimes in France and sought asylum here. The judge thought that it did so authorize him; for this reason he dismissed the writs and the relators appealed.

MANTON, Circuit Judge, dissenting.

*Certiorari granted 56 S.Ct. 680, 80 L.Ed. ——.

The controversy is very narrow; it is limited to the meaning of article 5 of our extradition "convention" with France (37 Stat. 1530), which is in these words: "Neither of the contracting Parties shall be bound to deliver up its own citizens or subjects under the stipulations of this convention." The first French extradition treaty was negotiated in 1843 (8 Stat. 580), and remained unchanged until 1909 (37 Stat. 1526); it required both parties to surrender all "persons" without condition, and under our interpretation of such clauses, it covered nationals of the contracting parties. Charlton v. Kelly, 229 U.S. 447, 33 S.Ct. 945, 57 L.Ed. 1274, 46 L.R.A.(N.S.) 397. But France, following a tradition more than a century old in 1843, did not so understand the words, and we had never been able to secure the delivery of a Frenchman for trial. She regarded it as an equivalent that, unlike ourselves, she will prosecute her nationals for crimes committed abroad. The language of article 5 appears for the first time in our extradition treaty with Prussia of 1852 (10 Stat. 964, art. 3); it is in contrast with article 24 of the almost contemporaneous treaty with the two Sicilies of 1855 (11 Stat. 639), which explicitly exempted "citizens and subjects of each of the high contracting parties." So it might be plausibly argued that throughout the fifties and sixties the Prussian clause meant that, although the parties were not obliged to surrender their own nationals, they reserved a discretionary power to do so; while internationally this would indeed be brutum fulmen, it might have its uses domestically. The Prussian clause appeared in substantially the same form in eight treaties between 1852 and 1874 without apparently raising any question;[1] but in that year the point was mooted under the Mexican treaty of the surrender of a Mexican, who having committed a crime in Texas, fled to Mexico. Secretary Fish refused to request the Mexican authorities to surrender him, and although his reasons are apparently not now accessible, the ruling itself was inconsistent with the belief that the clause reserved to both parties a discretionary power of surrender. If it did, it certainly was his duty to ask for the exercise of that discretion. In 1884 the converse

situation arose; an American, having committed an extraditable crime in Mexico, sought asylum here. Secretary Freylinghuysen refused to deliver him upon demand by Mexico, following the precedent of 1874. This ruling does not as such deny the existence of a discretionary power, but the reasons given at the time did deny it, for the treaty was construed as absolutely exempting nationals. The same sort of case arose again in 1888 and Secretary Bayard also refused to surrender the fugitive, accepting the ruling of Secretary Freylinghuysen and giving the same reasons more explicitly. Finally in 1891 as in 1874 a Mexican who had committed an extraditable crime here fled to Mexico. Secretary Blaine following the earlier precedents, refused to demand his surrender, declaring that the clause had been "held to preclude the surrender of a citizen of the United States"; and that for this reason "the government is precluded from demanding the extradition of fugitives in the present instance." In the same year a writ of habeas corpus came on before Judge Maxey in the Western District of Texas, to discharge from arrest an American woman charged with having killed a man in Mexico. Ex parte McCabe (D.C.) 46 F. 363. He sustained the writ, particularly relying upon the four precedents we have just cited. We are not immediately concerned with the correctness of that decision when rendered, though it was never appealed; but the fact that the treaty had been judicially as well as diplomatically construed is of importance.

Five years before, in 1886, when Secretary Fish's ruling was already twelve years old, and Secretary Freylinghuysen's was two, we negotiated an extradition treaty with Japan in which a variant for the first time appeared: "Neither of the contracting parties shall be bound to deliver up its own citizens or subjects under the stipulations of this convention, but they shall have the power to deliver them up if in their discretion it be deemed proper to do so." (Article 7, 24 Stat. 1017.) It will be at once observed that this did explicitly confer a discretion, which, as we have suggested, the Prussian clause might perhaps have originally borne. With these alternatives before us, we negotiated seventeen extradition

---

[1] Bavaria, 1853; Hanover, 1855; Austria, 1856; Baden, 1857; Norway and Sweden, 1860; Mexico, 1861; Peru, 1870; Belgium, 1874.

treaties between 1891 and 1909, and three more in 1909, including that at bar. Of these, fourteen adopted the Prussian clause,[2] and six, the Japanese.[3] Since 1909 the first has been repeatedly used, but the second apparently disappeared in 1905.

The Supreme Court in 1913 had before it an extradition treaty with Italy, which, like the French treaty of 1843, required the surrender of all "persons" unconditionally.[4] This the court held to include an American fugitive from Italy, though Italy, like France, refused to reciprocate, insisting that her power to prosecute her own nationals for crimes committed abroad was an equivalent. The decision is not therefore in point here, but the opinion (229 U.S. 447, pages 467, 468, 33 S.Ct. 945, 57 L.Ed. 1274, 46 L.R.A.(N.S.) 397), classified our treaties into two classes, those which require the surrender of nationals, and those in which the Prussian clause "exempts" them. Significantly the court speaks of the Japanese clause as a "qualification" of only the first. We cannot entirely disregard this language, as the respondent would have us do, though it is true that it is not as authoritative as though the case had turned upon it. A ruling of an English court (In re Galwey (1896) 1 Q.B. 230), merely goes to show how completely the clause should be interpreted by its history. Before 1887 the extradition treaty between Belgium and Great Britain had forbidden any surrender of nationals at all. Regina v. Wilson, 3 Q.B. 42. In that year it was amended and what we have called the Prussian clause was substituted. Obviously the amendment meant to make a change; it would make none at all, if the court continued to treat it as an exemption. The situation was just the reverse of that before us now; that is, an amendment to modify a treaty which had compelled the surrender of all nationals. Nothing relevant for us can therefore be inferred, because In re Galwey held that a discretionary power had been conferred.

■ It appears to us that the language of article 5 is not so uncompromising as to be immune from interpretation; few statutes are. A treaty is a contract, and a contract does not prescribe that the parties shall retain their freedom of action, unless it means to exempt them from other stipulations it may contain. An extradition treaty "binds" the parties, and as to matters which it was not meant to bind them, it was natural to say that they should not be "bound"; from that it is not to be assumed that they meant in addition gratuitously to assert that they reserved the power to surrender their own nationals if they chose. They could do so without any such reservation. Ker v. Illinois, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421; Greene v. U. S., 154 F. 401, 410 (C.C.A.5); U. S. ex rel. Donnelly v. Mulligan, 76 F.(2d) 511 (C.C.A.2). True, we did just that in the Japanese clause, and it was unnecessary internationally; but, as we have already suggested, it may have been adopted to give the Secretary power under our implementing statute, section 651, title 18, U.S. Code (18 U.S.C.A. § 651), which requires that there shall be some "treaty or convention for extradition." That means not only that a treaty exists, but that it assumes to cover the situation. If it be once conceded that the words do not speak so clearly that usage and practical construction are irrelevant, the relators' construction is surely right, for it would be hard to imagine a setting more convincing. The uniform rulings of four secretaries of state, backed by that of a court, were surely not disregarded when the words so construed were used later. This conclusion is confirmed by the parallel use on a number of occasions of the Japanese alternative, in which exactly that provision is explicitly adopted which the precedents declined to find implicit in the original. Finally, it is not likely that in dealing with France, a country whose position had been declared for over a hundred and fifty years, and which we knew would under no circumstances surrender her nationals, we should have reserved to her a discretion to do what she had consistently refused to do in the face of more peremptory words; or to ourselves a discretion to accept a unilateral burden.

---

[2] Sweden, 1893; Norway, 1893; Peru, 1899; Chile, 1900; Bolivia, 1900; Belgium, 1901; Servia, 1901; Denmark, 1902; Cuba, 1904; Spain, 1904; Panama, 1904; Honduras, 1909; Dominican Republic, 1909; France, 1909.

[3] Argentina, 1896; Orange Free State, 1896; Mexico, 1899; Guatemala, 1903; Nicaragua, 1905; Uruguay, 1905.

[4] Charlton v. Kelly, 229 U.S. 447, 33 S. Ct. 945, 57 L.Ed. 1274, 46 L.R.A.(N.S.) 397.

It is indeed unfortunate that there should be no way by which the relators can be punished, if they are guilty; and we should feel free to act more drastically if we had before us only customary law which had persisted beyond the period which had created it, and yet had not called forth enough opposition for its repeal. But we are dealing with a clause chosen by the President and Senate out of the diplomatic locker, and encrusted with its proper traditions, which in such matters count for much. Nielsen v. Johnson, 279 U.S. 47, 52, 49 S.Ct. 223, 73 L.Ed. 607; Factor v. Laubenheimer, 290 U.S. 276, 295, 54 S.Ct. 191, 78 L.Ed. 315. Even though we thought we could infer how they would act in this specific case, a decent reserve and a justified doubt should restrain the substitution of our own judgment for the words they selected. But it is by no means self-evident that they would consider the prosecution of Frenchmen in French courts an equivalent of their surrender; and even if they did, other considerations might block a bargain, for into diplomatic negotiations much enters which does not see the light. Though we were not ourselves disposed to higgle, we should have no right to impose our disposition upon the result of their negotiations. The arguments by which the exemption is defended may not indeed be persuasive; "les juges naturels" may be no more than an euphemism for friendly bias; but nationalism is not dead, and most nations have shown a persistent repugnance to submit their citizens to foreign courts. We have indeed an honorable record; but it is uncertain how far our diplomacy is yet prepared to give where it does not receive.

Orders reversed; relators discharged.

MANTON, Circuit Judge (dissenting).

This is a consolidated appeal by the relators, B. Coles Neidecker, George W. Neidecker, and Aubrey Neidecker, who admittedly have always been citizens of the United States, from orders entered on August 21, 1935, dismissing their several petitions for writs of habeas corpus. The relators were taken into custody by the police commissioner of the city of New York under warrants issued by the United States commissioner on July 25, 1935, upon complaint of the acting consul general of France in the city of New York, charging relators with crimes clearly extraditable under article 2 of the Treaty of Extradition of January 6, 1909, between the United States and France (37 Stat. 1527).

Their petitions for writs of habeas corpus are grounded on, first, that American citizens are absolutely and of right exempt from extradition to France under article 5 of said treaty; and, secondly, that to construe article 5 as giving the Chief Executive a discretion to surrender a citizen would amount to an unconstitutional delegation of power and, moreover, in violation of the Fifth Amendment.

While neither question is new in Anglo-American jurisprudence, the paucity of direct judicial precedents and their apparent conflict make it imperative that we examine it afresh and in some detail, with a view to determining which of the divergent views expresses for this court the correct construction of provisions couched in the terms of article 5, of which there are a large number in our other treaties with foreign powers.

Under article 1 of the treaty here involved (37 Stat. 1526), the contracting powers "mutually agree to deliver up persons who, having been charged with or convicted of any of the crimes or offenses" mentioned in article 2, "shall seek an asylum or be found within the territories of the other." Under article 5, "neither of the contracting Parties shall be bound to deliver up its own citizens or subjects under the stipulations of this convention."

These two articles represent the most satisfactory formula conceived thus far to reconcile two seemingly conflicting tendencies in the plane of international penal law. The one tendency is toward the fullest possible international cooperation for the suppression of crime by facilitating the apprehension of common criminals who have escaped from the territorial jurisdiction of the locus delicti; the other tendency is toward the protection of nationals against prosecution in foreign tribunals infiltrated with national, racial, or religious animosities, or administering a cruel, inhuman, or antiquated system of laws or refusing reciprocity. These two tendencies thus present delicate questions of law and policy which it has been the constant effort of statesmen and jurists to reconcile.

The extradition of nationals has been, unquestionably, one of the most debated topics of international concern; and, although the weight of *policy* is apparently against it, yet the weight of *law* is for it. Dealing, as we are, with a French treaty, it is not amiss to advert to the legislative history of France, which has not been entirely uniform on this question. In 1376 France and Savoy made a treaty for the reciprocal extradition of criminals, which applied also to their respective nationals: *omnes et singulos homines nostros nobis mediate vel immediate subjectos, qui delinquerunt et quomodolibet in futurum in comitatu Sabaudiae.* 5 Isambert's Recueil Général des Anciennes Lois Francaises, 479. An imperial decree of October 23, 1811, outlined the procedure to be observed by the French authorities in acquiescing to the demands for the extradition of French subjects. 12 Bulletin des Lois (1836) 324. On the other hand, the Extradition Laws of April 4, 1879 (article 1) and of March 30, 1927 (article V), forbid his extradition. This reversal in the practice of extradition has been due, as will be shown presently, to the exaggerated development in Continental Europe of the conception of *personal jurisdiction,* which has not, however, found much favor in the Anglo-American school of legal thought. Be this as it may, it is quite safe to say that the tendency in more recent times has been decidedly to discard the false arguments with which the practice of the nonextradition of nationals has been upheld and to provide, in one form or another and under proper guaranties, for their extradition; and this practice is more consonant with the true principles and spirit of international penal law. Over a century ago, Chief Justice Marshall, in the case of The Exchange, 7 Cranch, 116, 144, 3 L.Ed. 287, announced the principle that: "When private individuals of one nation spread themselves through another as business or caprice may direct, mingling indiscriminately with the inhabitants of that other, or when merchant vessels enter for the purposes of trade, it would be obviously inconvenient and dangerous to society, and would subject the laws to continual infraction, and the government to degradation, if such individuals or merchants did not owe temporary and local allegiance, and were not amenable to the jurisdiction of the country. Nor can the foreign sovereign have any motive for wishing such exemption."

This general principle has found concrete application to the question of the extradition of nationals. The Supreme Court, in Neely v. Henkel, 180 U.S. 109, 123, 21 S.Ct. 302, 307, 45 L.Ed. 448, said: "We are reminded of the fact that the appellant is a citizen of the United States. But such citizenship does not give him an immunity to commit crime in other countries, nor entitle him to demand, of right, a trial in any other mode than that allowed to its own people by the country whose laws he has violated and from whose justice he has fled. When an American citizen commits a crime in a foreign country, he cannot complain if required to submit to such modes of trial and to such punishment as the laws of that country may prescribe for its own people, unless a different mode be provided for by treaty stipulations between that country and the United States."

In England, the Court of Queen's Bench in Queen v. Glanz (1882) 9 Q.B.D. 93, 100, stated the same view. "I would say that the leading principle which underlies all questions of nationality as applied to crime committed within any particular country is this. Whatever rights, civil or otherwise, a man may have which may be affected by his domicile, it is and must be perfectly clear by the law of all nations that each person who is within the jurisdiction of a particular country under which he commits a crime is subject to that jurisdiction; otherwise the criminal law could not be administered according to any civilized method."

That this is the doctrine of international law is the opinion of the Supreme Court in the case of Charlton v. Kelly, 229 U.S. 447, 467, 33 S.Ct. 945, 952, 57 L.Ed. 1274, 46 L.R.A.(N.S.) 397, wherein that court, after a searching inquiry into the question, delivered itself thus: "The conclusion we reach is, that there is no principle of international law by which citizens are excepted out of an agreement to surrender 'persons,' where no such exception is made in the treaty itself. Upon the contrary, the word 'persons' includes all persons when not qualified as it is in some of the treaties between this and other nations."

The Supreme Court of Mexico in 1878, speaking through Chief Justice Vallarta

(one time Minister for Foreign Affairs of his country), in the case of the Extradition of J. M. Dominguez and F. Barrera (1 Vallarta, Cuestiones Constitucionales [1879] 1, 35), Mexican citizens whose surrender was demanded by the authorities of the United States, said that the extradition of nationals is "a desideratum of the most enlightened publicists; is a tendency toward the international well being of nations; is a requirement of civilization, which does not wish that the operation of justice should stop at the frontiers."

International recognition for this principle has not been wanting. Article 20 of the Montevideo Treaty on International Penal Law (1888–1889) provides: "Extradition exercises all its effects, and in no case shall the nationality of the accused prevent it."

A legal scholar recently expressed his opinion on this question (Prof. Puente on Principles of International Extradition in Latin America, 28 Mich. Law Review [1930] 710) writing that it rests "on far more tenable grounds than the doctrine to which we have alluded [of the non-extradition of nationals]—a doctrine which, in a veritable sense, is a survival from an age more primitive in the concepts and administration of substantive and adjective law than our own. The present enlightened state of public opinion in the countries comprising the family of nations; the tolerably moderate character of their laws; the generally honorable, impartial and competent composition of their judiciary; and finally, the potential danger of diplomatic interposition by foreign governments in behalf of their nationals in the event of a miscarriage or denial of justice: these evident factors, when taken together, show, beyond a doubt, the untenableness of the prevailing opinion in Latin America and elsewhere today in respect to the surrender of their own nationals for trial in the tribunals of a foreign state."

So much, then, for the history of this interesting subject. As we approach the analysis of the specific treaty and statutory provisions before us, we find that the sum total of the obligations assumed by the contracting stated is "to deliver up persons" (Article 1, Treaty of January 6, 1909, 3 Malloy's Treaties, 2580 [37 Stat. 1526]) accused of certain crimes; and that, in order to carry out this obligation, Congress has outlined the procedure to be followed in effecting the provisional detention of such "person" sections 651, 653, tit. 18 U.S.C.A. In both cases the term employed to designate the subject of the request for extradition is "person." In the opinion of the Supreme Court in Charlton v. Kelly, 229 U.S. 447, 465, 467, 33 S.Ct. 945, 951, 57 L.Ed. 1274, 46 L.R.A.(N.S.) 397, the term "persons" employed in article 1 of the Treaty of Extradition of March 23, 1868, between this country and Italy (15 Stat. 629) was held to include etymologically "citizens as well as those who are not." Article 5 of the French treaty (37 Stat. 1530) recites, of course, that: "Neither of the contracting Parties shall be bound to deliver up its own citizens or subjects under the stipulations of this convention." The question is whether this provision excludes absolutely the surrender of a citizen, or merely clothes the Chief Executive with a discretion to grant such surrender or not, as the circumstances of each case may dictate. It is upon this very question that the courts are in disagreement. Appellants cite in their support the case of Ex parte McCabe (D.C.W.D.Tex.) 46 F. 363, 375, decided in 1891; and appellees rely on the English case of In re Galwey [1896] 1 Q.B.D. 230. The McCabe Case had under consideration article 6 of our Treaty of Extradition with Mexico of 1861 (12 Stat. 1199), which is identical with article 5 of the French Treaty now before this court. The Galwey Case involved article 1 of the Treaty of Extradition of 1876 between Great Britain and Belgium, as amended April 21, 1887, which said that: "In no case, nor on any consideration whatever, shall the high contracting parties be bound to surrender their own subjects, whether by birth or naturalization." Disregarding inconsequential changes of phraseology, the effect of these provisions is that the contracting governments *shall not be bound* to give up their own nationals to the other. The court in the McCabe Case considered the request of the Mexican authorities for the extradition of a citizen of the United States charged with murder; and, while it said that under article 1 of the treaty the term "persons" would justify the surrender of a citizen, it made the following dogmatic declaration without any exposition of reasons in its support: "But the treaty does not stop there. A sub-

sequent limiting clause denies the obligation to surrender a citizen: 'Neither. of the contracting parties shall be bound to deliver up its own citizens under the stipulations of this treaty.' The obligation to deliver being denied, upon what can rest the authority?"

The whole fabric of the McCabe Case rests on what was called the "practical construction given that article by the department of state," in the Trimble Case in 1889. In that case, Secretary of State Frelinghuysen said: "The treaty confers upon the President *no affirmative power* to surrender an American citizen * * * I understand the treaty with Mexico as reading thus: The President shall be bound to surrender any person guilty of crime, unless such person is a citizen of the United States."

The construction placed upon the terms of a treaty by the department of our government charged with the supervision of the foreign relations of the nations is entitled to respectful consideration and to much weight (Charlton v. Kelly, 229 U.S. 447, 468, 33 S.Ct. 945, 57 L.Ed. 1274, 46 L.R.A.(N.S.) 397; Sullivan v. Kidd, 254 U.S. 433, 442, 41 S.Ct. 158, 65 L.Ed. 344); but, as the construction of a treaty is a judicial question (Sullivan v. Kidd, supra), the courts are not necessarily bound by an executive construction which they may deem to be erroneous, and must therefore be at liberty to use their independent judgment in arriving at the true meaning of its provisions. This was very clearly and forcefully illustrated in United States v. Rauscher, 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425, in which the official construction placed by the American Secretary of State, Mr. Fish, on the treaty of extradition with Great Britain of 1842, was rejected by the court in favor of the construction urged by the British Foreign Minister, Lord Derby. It is difficult to accept Secretary Frelinghuysen's construction of the Mexican treaty for two reasons. In the first place, it is not correct to say that the treaty does not confer upon the President an "affirmative power to surrender an American citizen." Article 1 does that when it provides for the extradition of "persons." Charlton v. Kelly, supra. In the second place, the Secretary's construction changed the extradition formula from the *discretionary* to the *prohibitive,* and in doing so he did not merely construe the treaty—he also changed it.

In opposition to the views of our Executive Department, and incidentally to show the evident lack of consistency on the part of our authorities in construing the treaty under consideration in the McCabe Case, I cite the construction given by the Supreme Court of Mexico in 1878 to article 6 of that treaty, in the matter of the Extradition of J. M. Dominguez and F. Barrera, supra, both of whom were citizens of Mexico, arrested upon request of the American authorities. Chief Justice V llarta, speaking for the court, said (1 Cuestiones Constitucionales [1879] 34):

"It has been claimed that the final clause of article 6 of the treaty of December 11, 1861, prohibits, or at least does not authorize the extradition of nationals. This cannot be asserted without disregarding the value of the words of our language. The treaty of extradition celebrated with Italy, prohibits that extradition when it expresses itself thus: 'The extradition shall not take place if the accused is a national of the country' etc. Between those words and, those of the treaty celebrated with the United States, which read: 'Neither of the contracting parties shall be bound to deliver up its own citizens under the stipulations of this treaty': between both clauses, I repeat, there exists all the distance that there is between prohibition and freedom. If the American treaty had intended to even restrict that freedom, it should have used words which would not have left it alive. But to understand both treaties in the same prohibitive sense, is something that the meaning of the words will not permit.

"The extradition of nationals may be arranged in treaties in one of three ways: either prohibiting it, as is done in the treaty with Italy; or making it obligatory, so that the surrender of citizens would be inexcusable; or permitting it —leaving it to the discretion of the Governments, as is done in the final part of article 6 of the treaty with the United States. This makes it difficult to mistake the prohibitive formula with the obligatory, or either of them with the discretionary. From the words of the treaty itself I conclude, therefore, that the extradition of nationals far from being forbidden, is permitted between Mexico and the United States."

A few years after this question in the Supreme Court of Mexico, Lord Russel,

C. J., of the Court of Queens Bench in England, in the case of In re Galwey, supra, construing the treaty of 1887 between Great Britain and Belgium, quoted above, said: "What does that mean? It surely means that, while they are not bound, they may under the treaty and any legal enactment which relates to the treaty make such extradition."

We thus have a very respectable weight of judicial opinion, supported by unanswerable arguments, in favor of the *discretion* or *political* formula of extradition as illustrated in the Mexican, Belgium, and French treaties. If article 6 had been omitted from the treaty now before us, would not the relators be liable to extradition under the term "person" of article 1? They certainly would be. Why, then, argue that our government is prohibited from surrendering a citizen merely because it *shall not be bound* to do so? The two articles should be construed, if possible, in a way that will not impair each other, unless a different intention is evident from a comparison of their terms; and to construe article 6 as giving discretionary powers to the Executive will leave the scope of article 1 under international law unimpaired, without doing violence to the words or reasonable implications of article 6.

It is true, of course, that article 4 of the Extradition Convention of 1899 between the United States and Mexico (31 Stat. 1822) expanded the provisions of article 6 of the Convention of 1861 (considered in the McCabe Case) to read: "Neither of the contracting parties shall be bound to deliver up its own citizens under the stipulations of this convention, but the executive authority of each shall have the power to deliver them up, if, in its discretion, it be deemed proper to do so."

But the reason was merely to clear up doubts cast upon the plain meaning of the provisions of article 6 of the 1861 convention by an erroneous executive construction accepted without question by an inferior federal tribunal in the McCabe Case. The amended provision attempts to clarify, but not to amplify, the short statement of article 6 of the 1861 convention. It adds nothing because, where the country *is not bound* but *may* surrender, discretion is necessarily implied.

Differing from the *discretionary* formula is the *prohibitive;* a sample of which is the Italian treaty quoted by Chief Justice Vallarta in his opinion, and the Swiss treaty, which was considered by the Court of Queens Bench in Queen v. Wilson [1877] 3 Q.B. 42, 44, of which Cockburn, C. J., said: "The treaty does not give a discretion. It says no British subject shall be delivered up."

This brings us to the last question, namely, whether to construe article 5 of the treaty as giving the Executive a discretion to surrender citizens would amount to an unconstitutional delegation of power depriving such citizens of liberty without the due process of law guaranteed by the Fifth Amendment. To clothe the Executive with discretion in such matters, following the approved diplomatic formula, can be regarded as "neither capricious nor arbitrary, as has been supposed, but enlightened by considerations of national convenience which must be borne in mind at every step, and subject to the rules of the law of nations. The latter, which does not guarantee the impunity of crime but which today tends, on the contrary, to enforce respect for the maxim that foreign soil should not be a safe asylum for criminals, enemies of mankind, has commenced to formulate certain theories which are already recognized by civilized peoples. One of them is this: the country which does not give extraterritorial effect to its penal laws over its nationals and which consequently, cannot punish them in its tribunals for the crimes committed abroad, should lend itself to grant the extradition of its nationals, providing considerations of lack of reciprocity, lack of guarantees in the legislation of the demanding state, or others purely political of which the sole judge is the government of the country of asylum, do not oppose the extradition. This theory is defended with unanswerable arguments by contemporary publicists of renown, and is already sanctioned in some treaties." Vallarta, C. J., in Extradition of J. M. Dominguez and F. Barrera, 1 Cuestiones Constitucionales (1879) 39.

But the main difficulty with appellants' contention that the discretionary formula is unconstitutional is that it reflects a false conception of what "due process of law" means, and of the full scope of the treaty making power of the general government. A treaty, according to the explicit declaration of the Constitution, is part of the supreme law of the land. Article

6, par. 2, Constitution; Ware v. Hylton, 3 Dall. 199, 1 L.Ed. 568; State of Missouri v. Holland, 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641, 11 A.L.R. 984. The power of the national government to enter into treaties is not limited by any express provision of the Constitution, and extends to all proper subjects of negotiation between our government and other nations. Asakura v. Seattle, 265 U.S. 332, 341, 44 S.Ct. 515, 68 L.Ed. 1041; In re Ross (Ross v. McIntyre), 140 U.S. 453, 463, 11 S.Ct. 897, 35 L.Ed. 581; De Geofroy v. Riggs, 133 U.S. 258, 267, 10 S.Ct. 295, 33 L.Ed. 642. A proper subject of such negotiation is undoubtedly the extent to, and conditions under which, the right of a foreign government to claim fugitives from justice will be recognized and enforced. Terlinden v. Ames, 184 U.S. 270, 289, 22 S.Ct. 484, 46 L.Ed. 534. If, then, a treaty gives the Executive a discretion to deliver up a citizen, such provision, being authorized under the Constitution and a part of the supreme law of the land, does not clash in any sense with the Fifth or any other amendment. Hurtado v. People of California, 110 U.S. 516, 535, 4 S.Ct. 111, 292, 28 L.Ed. 232. A contention similar to this was dealt with in Ex parte Charlton (C.C.) 185 F. 880, 884, affirmed 229 U.S. 447, 33 S.Ct. 945, 57 L.Ed. 1274, 46 L.R.A.(N.S.) 397, in which Judge Rellstab, in disposing of it, said:

"The next contention is that, under our Constitution, the accused, being an American citizen, cannot be extradited unless there is a positive obligation on the part of the United States to surrender its citizens when accused of having committed a crime in a foreign country. To extradite, unless there is a positive obligation, is said to be contrary to the constitutional guaranty generally known as the 'due process of law' provision in our Constitution; that in a government like ours, with its constitutional limitations, no American citizen can be surrendered to another country merely out of courtesy or in a spirit of international comity.

"Reduced to its last analysis, that contention, I think, is to be determined by this: Whether there is an existing treaty between the United States and Italy which requires that Charlton shall be surrendered to the demanding government. * * * If an extradition treaty subsists with a foreign government, under our Constitution and law of the land, a surrender of the prisoner in pursuance thereof would be in accordance with the 'due process of law' constitutional requirement."

Statesmen, in framing international extradition commitments, must be presumed to anticipate their consequences more or less accurately; and the courts, when inquiring into the meaning of such commitments, should consider carefully the consequences flowing from this or that construction as the result likely to have been anticipated by the contracting parties, and should never assume that such commitments are intended to bear fruits inimical to the social order. In construing article 5 we should not assume that the contracting states intended to espouse crime or encourage its impunity. This is, in effect, what appellants urge us to hold. In countries where the penal legislation treats crime as personal, and punishes the citizen or subject for crimes he may commit abroad (e. g. article 5, Code d'Instruction Criminelle, France; article 7, Code Penal, Denmark; article 4, § 1, Code Penal, Poland; article 9, Codice Penale, Italy; article 12, Codigo Penal, Spain), the construction advocated by appellants might be entitled to weight; but in countries where crime is regarded as territorial and punishable only in the locus delicti, as it is here, to construe a treaty as exempting a citizen from extradition, except in the clearest case, would tend to encourage disturbances in the social order of foreign nations, and to reward the wrongdoer with impunity the moment he takes refuge in our midst. I cannot reasonably suppose that such was the intention of our government in agreeing to those provisions. Such result would constitute what Chief Justice Cockburn called a "blot upon the law." Queen v. Wilson, supra. This question gains support in Wharton, who says (1 Digest of Int. Law [2d Ed.] 1887, § 273, p. 807):

"Where the question is one of discretion, the better rule is that wherever, by the jurisprudence of a particular country, it is capable of trying one of its subjects for an offense alleged to have been committed by such subject abroad, the extradition in such case should be refused, the asylum state then having the right of trying its own subject by its own laws. When, however, it does not assume jurisdiction of extraterritorial

crimes committed by its subjects, then extradition should be granted."

The judgment should be affirmed.